## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| BENEDETTINI CABINETS, L.P., | ) | Case No. 1:22-cv-00737 |
| | ) | |
|     Plaintiff and | ) | Judge J. Philip Calabrese |
|     Counter-Defendant, | ) | |
| | ) | Magistrate Judge Thomas M. Parker |
| v. | ) | |
| | ) | |
| THE SHERWIN-WILLIAMS | ) | |
| COMPANY, | ) | |
| | ) | |
|     Defendant and | ) | |
|     Counter-Claimant. | ) | |
| | ) | |

## OPINION AND ORDER

Benedettini Cabinets operates a consumer cabinet manufacturing business. The Sherwin-Williams Company supplied certain coatings to Benedettini for application to its cabinets as part of the finishing process. One in particular uses an ultraviolet curing process to give a longer-lasting finish to wood cabinets. Alleging that this UV coating was defective because it developed a "white, hazy deposit" known as frost, Benedettini sued Sherwin-Williams asserting fraud, tort, and warranty claims. Sherwin-Williams moves for partial judgment on the pleadings on all but certain of the warranty claims. (ECF No. 34.) Benedettini opposes. (ECF No. 37; ECF No. 41.) For the reasons that follow, the Court **GRANTS IN PART** and **DENIES IN PART** the motion.

## STATEMENT OF FACTS

The pleadings set forth the following facts, which the Court construes in the light most favorable to Benedettini as the non-moving party.

### A.    Background and Development of the UV 257 Coating

Benedettini Cabinets produces residential cabinets primarily for sale in Texas and the surrounding Gulf South region.   (ECF No. 19, ¶ 5, PageID #142.) Headquartered in Cleveland, Ohio, Sherwin-Williams is a manufacturer of paints and coatings.  (*Id.*, ¶¶ 4–5.)  Before 2017, Benedettini purchased most of the UV coating it requires to cure finished cabinets from Valspar.  (*Id.*, ¶¶ 7–8, PageID #143.) In 2016, Sherwin-Williams announced that it had reached an agreement to acquire Valspar.  (*Id.*, ¶ 10, PageID #143.)  After Benedettini received this news, its general manager Matthew Bible contacted Sherwin-Williams representative Tim Jones.  (*Id.*) Bible sought to ensure that Benedettini could continue to receive the same UV coating after the deal closed.   (*Id.*)   According to Benedettini, Jones "ma[de] a series of promises that Sherwin-Williams would supply a comparable UV coating" to the Valspar coating that Benedettini purchased before the acquisition.  (*Id.*, ¶ 10, PageID #144.)  When Sherwin-Williams acquired Valspar in 2017, the Valspar UV coating division was spun off to another company.  (*Id.*, ¶ 11, PageID #144.)

Also in 2017, the parties began testing Sherwin-Williams's UV coatings on Benedettini's cabinets at Benedettini's plant in Texas.  (*Id.*, ¶ 15, PageID #145.) During this time, Benedettini's representatives repeatedly told Sherwin-Williams that, if it could supply a UV coating comparable to Valspar's, Sherwin-Williams would

2

gain its exclusive business.  (*Id.*, ¶¶ 12–15, PageID #144–45; ECF No. 25, ¶¶ 12–15, PageID #213–14.)

From May 2017 to November 2017, Plaintiff alleges that Jones and Sherwin-Williams representatives Rick Romero, Steve Nicks, Mark Portwood, and Alex Blahnik represented to Bible, Steve Benedettini, and other Benedettini employees that Sherwin-Williams could provide the Valspar coating or a comparable UV coating. (ECF No. 19,  ¶¶  14,  19  &  37,  PageID #144–46 & #150.)  Sherwin-Williams representatives visited Benedettini's plant in 2017 and "took over the UV coating equipment at the factory" to test and tweak the formulas.  (*Id.*, ¶ 15, PageID #145.) Plaintiff alleges that in June 2017, "[a]fter much work, Sherwin-Williams claimed to have replicated the performance aspects of the Valspar UV coating."  (*Id.*)

In October 2017, Sherwin-Williams conducted a final test and the "results appeared to be impressive."  (*Id.*, ¶ 17, PageID #145–46.)  Benedettini alleges that after these tests Sherwin-Williams "selected" UV 257 as best suited for its needs (*id.*, ¶ 17, PageID #146), but the parties disagree on who selected this UV coating (*id.*; ECF No. 25, ¶ 17, PageID #214).  Further, Benedettini alleges that "numerous agents of Sherwin-Williams" made the following representations:  (1) Sherwin-Williams could provide the Valspar UV coating or a coating with "the exact same performance and durability" that "remain[s] issue-free and durable for years"; (2) UV 257 was suitable for use in the Gulf South; (3) UV 257 was suitable for light finishes; and (4) other customers used UV 257 without issue.  (ECF No. 19, ¶¶ 18 & 37, PageID #146 & #150.)  Specifically, Sherwin-Williams division president Dennis Karnstein made

3

the same promises and assurances while visiting Benedettini on or about October 10, 2017.  (*Id.*, ¶ 19, PageID #146.)

Since 2017, Benedettini purchased over $5 million worth of UV 257 coating from Sherwin-Williams under "this arrangement" and installed cabinets coated in UV 257 in over two thousand homes in the Gulf South region.  (*Id.*, ¶¶ 20 & 31, PageID #146–47 & #149.)

### B.    Benedettini Cabinets Begin to Frost and Haze After Installation

In May 2020, Benedettini customers began posting online that their cabinets were developing a white, hazy deposit or "frost."   (*Id.*, ¶ 22, PageID #147.) Benedettini determined that cabinets finished with UV 257 developed this frost when exposed to humidity, an issue Benedettini had not previously experienced with its cabinets.  (*Id.*)

Benedettini notified Sherwin-Williams of the issue, and Sherwin-Williams initiated its own investigation.  (*Id.*, ¶ 24, PageID #147.)  Sometime after May 2020, Sherwin-Williams initially "attempted to blame a chemical neighbor of Benedettini" for causing the issue by emitting an airborne surfactant.  (*Id.*, ¶ 24, PageID #147–48.) Sherwin-Williams dismissed that theory in March 2021.  (*Id.*, ¶ 25, PageID #148.) During the investigation, Benedettini also discovered that cabinets stained in a lighter finish and treated with UV 257 UV were yellowing.  (*Id.*, ¶ 26, PageID #148.) Sherwin-Williams representative Kevin LaFavers represented to Benedettini's plant manager Kevin Roach that other customers used UV 257 without issue.  (*Id.*, ¶ 27, PageID #148.)

Plaintiff alleges that Sherwin-Williams switched Benedettini to a different UV coating, UV 292, in March 2021.  (*Id.*, ¶ 28, PageID #148.)  At that time, Sherwin-Williams employee Mark Portwood allegedly informed Benedettini that UV 257 was not intended for use on light stains.  (*Id.*, ¶ 30, PageID #149.)  By then, Benedettini had been applying UV 257 to light stains for at least four years "at Sherwin-William's direction."  (*Id.*)  In June 2021, Sherwin-Williams started selling Benedettini another coating, UV 297, for darker stained cabinets.  (*Id.*, ¶¶ 28–29, PageID #148.)

To date, Benedettini has had to remove and refinish cabinets in 60 homes due to frosting.  (*Id.*, ¶ 31, PageID #149.)  This process typically costs more than $15,000 per home.  (*Id.*)

## STATEMENT OF THE CASE

Plaintiff filed an amended complaint on September 21, 2022 asserting four claims for relief:  fraud/fraudulent inducement (Count One);  negligent misrepresentation (Count Two); breach of express warranty (Count Three); and breach of implied warranties (Count Four).  (ECF No. 19.)  Plaintiff alleges that Defendant and its employees misrepresented UV 257's performance capabilities to induce Benedettini to purchase the product.  Plaintiff argues that those misrepresentations are actionable and that Defendant breached express and implied warranties because UV 257 frosted on Benedettini's cabinets.

On March 7, 2023, Defendant moved for partial judgment on the pleadings on Counts One, Two, and Three.  (ECF No. 34.)  Defendant argues that a written contract between Benedettini and Sherwin-Williams, the 2017 Supply Agreement, bars

Plaintiff's fraud, negligent misrepresentation, and express warranty claims and that the economic loss rule bars Plaintiff's tort claims.  (ECF No. 34-1, PageID #429–33.) Defendant also argues that Count I fails to plead fraud with particularity under Rule 9(b), that Plaintiff fails to plead the elements of its fraud and negligent misrepresentation claims, and that Plaintiff's negligent misrepresentation claim is untimely.  (*Id.*, PageID #434–44.)

## ANALYSIS

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  A motion for judgment on the pleadings essentially constitutes a delayed motion under Rule 12(b)(6) and is evaluated under the same standard.  *See, e.g.*, *Holland v. FCA US LLC*, 656 F. App'x 232, 236 (6th Cir. 2016).    In other words, judgment on the pleadings is appropriate where, construing the material allegations of the pleadings and all reasonable inferences in the light most favorable to the non-moving party, the Court concludes that the moving party is entitled to judgment as a matter of law. *Anders v. Cuevas*, 984 F.3d 1166, 1174 (6th Cir. 2021).  In construing the pleadings, the Court accepts the factual allegations of the non-movant as true, but not unwarranted inferences or legal conclusions.  *Holland*, 656 F. App'x at 236–37 (citing *Gregory v. Shelby Cnty.*, 220 F.3d 433, 446 (6th Cir. 2000)).

A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v.*

*Twombly*, 550 U.S. 544, 556 (2007)). To survive a motion to dismiss, a complaint must "raise a right to relief above the speculative level" into the "realm of plausible liability." *Twombly*, 550 U.S. at 545, 557 n.5.

Therefore, the Court must distinguish between "well-pled factual allegations," which must be treated as true, and "naked assertions," which need not be. *See Iqbal*, 556 U.S. at 678 ("Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement.") (cleaned up); *see also, e.g.*, *Center for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 375 (6th Cir. 2011) (determining that, because some of the plaintiff's factual allegations were "not well-pleaded[,]" "their conclusory nature 'disentitles them to the presumption of truth'") (quoting *Iqbal*, 556 U.S. at 681).

## I.    The 2017 Supply Agreement

Sherwin-Williams argues that a contract between the parties, the 2017 Supply Agreement, is fatal to Counts One, Two, and Three of Benedettini's amended complaint because those claims rely on alleged representations that Sherwin-Williams made before the parties executed the agreement. (ECF No. 34-1, PageID #429–32.) Because the contract governs the parties' agreement and includes an integration clause, Sherwin-Williams argues that the parol evidence rule bars Benedettini's claims. (*Id.*, PageID #430–32.) In opposition, Plaintiff argues that the 2017 Supply Agreement does not govern the sale of UV 257 to Benedettini because UV 257 is not listed on Exhibit A to the agreement as a "Product." (ECF No. 41, PageID #509–10.) For this reason, Benedettini maintains that the applicability of

the Supply Agreement to Plaintiff's claims presents a dispute of fact that the Court cannot resolve at the pleading stage.  (*Id.*, PageID #507 & #512–13.)

## I.A.    The Record

At the outset, Benedettini argues that the Court should not consider the 2017 Supply Agreement at all because it was not attached to the amended complaint and is not central to its claims.  (ECF No. 41, PageID #507–09.)  Without attaching the 2017 Supply Agreement to its amended complaint, Benedettini refers to its business relationship with Sherwin-Williams as an "arrangement."  (ECF No. 19, ¶ 20, PageID #146.)  Sherwin-Williams attached the Supply Agreement to its answer.  (ECF No. 25-1.)

On a motion under Rule 12(c), the Court's inquiry is limited to the content of the complaint, although it may also consider matters of public record, orders, items appearing in the record of the case, and exhibits attached to or made part of the complaint.  *Amini v. Oberlin College*, 259 F.3d 493, 502 (6th Cir. 2001).  "While documents integral to the complaint may be relied on, even if they are not attached or incorporated by reference, it must also be clear that there exist no material disputed issues of fact regarding the relevance of the document."  *Mediacom Se. LLC v. BellSouth Telecomms., Inc.*, 672 F.3d 396, 400 (6th Cir. 2012) (cleaned up).

Without question, the parties' dispute will ultimately require a determination of whether the 2017 Supply Agreement governs Benedettini's claims and, if so, how its terms apply to UV 257.  In this respect, the contract is central to the dispute, and no amount of creative pleading can avoid the propriety of its consideration in connection with the motion for judgment on the pleadings.  Further, on March 14,

2023, the Court put the parties on notice that it considers the Supply Agreement a proper part of the record at the pleading stage.  (ECF No. 35.)

Benedettini relies on *Composite Technologies, LLC v. Inoplast Composites*, 925 F. Supp. 2d 868 (S.D. Ohio 2013), to support its argument that the Court should not consider the Supply Agreement at all in ruling on Defendant's pending motion for judgment on the pleadings.  (ECF No. 41, PageID #509.)  In that case, the district court concluded that it "must refrain from ruling whether a contract has been created until the disputed series of documents are properly before the Court and the matter is fully briefed such as in a motion for summary judgment."  *Id.* at 874; *see also Mediacom*, 672 F.3d at 400 (reversing the district court's ruling because it was specifically premised on the content of a settlement agreement that was not attached to the complaint).

Whatever the particular facts that made such rulings appropriate in *Composite Technologies* and *Mediacom*, consideration of the Supply Agreement is integral to the parties' dispute in this case.  Further, there is no dispute that it exists and governs at least some aspects of the relationship between the parties, though perhaps not the products in dispute.  Therefore, the Court considers the 2017 Supply Agreement at this stage of the proceedings without converting the motion to one for summary judgment.

## I.B.    Applicability of the Supply Agreement

Several of the arguments that Sherwin-Williams advances depend on the applicability of the 2017 Supply Agreement to Benedettini's claims.  (ECF No. 34-1, PageID #429–33.)  Sherwin-Williams argues that the 2017 Supply Agreement

governs all business between Sherwin-Williams and Benedettini for the supply of paints and coatings.  (*Id.*, PageID #425–27.)  To support this argument, Sherwin-Williams points to Paragraph 2 of the Supply Agreement, which describes it as a sort of requirements contract.  Paragraph 2 reads:

> During the term of this Agreement, Customer shall utilize Sherwin-Williams as Customer's supplier for paints, coatings, and related products utilized by Customer.  Specifically, Customer shall purchase its requirements for all paints, coatings, and related products from Sherwin-Williams.  Upon receipt of a purchase order from Customer, Sherwin-Williams hereby agrees to sell to Customer the paints, coatings, and related products that are set forth on Exhibit A (collectively referred to herein as the "Products").

(ECF No. 25-1, PageID #232.)  Sherwin-Williams interprets the first two sentences of Paragraph 2 to mean that the Supply Agreement is a requirements contract under which Benedettini agrees to purchase *all* coatings, paints, and other products it uses in its operations from Sherwin-Williams.  (ECF No. 34-1, PageID #425–26.)

As its next step in the argument, Sherwin-Williams points to the integration clause in Paragraph 17, which reads:

> This Agreement, including any Exhibits hereto, constitutes the entire agreement of the parties relating to the subject matter hereof and supersedes all prior written and/or oral agreements and understandings between the parties.  Except as provided herein, there are no other representations, warranties, undertakings, or agreements between the parties with respect to the subject matter of this Agreement.

(ECF No. 25-1, PageID #234.)

Sherwin-Williams argues that, because Paragraph 2 purports to govern all paint and coating sales between the parties, and Paragraph 17 disclaims all warranties other than the limited warranty "provided herein" without reference to

"Products," whether Exhibit A lists UV 257 as a "Product" has no bearing on the meaning of the contract as a matter of law.  (ECF No. 34-1, PageID #430.)

This creative argument fails to avoid the dispute of fact over whether the Supply Agreement governs the parties' relationship and Benedettini's claims.  For this argument to work, one must overlook the contradictory language within Paragraph 2.  After the second sentence recites the agreement that Benedettini will purchase its requirements for all paints and coatings from Sherwin-Williams, the third sentence qualifies or limits that broad language.  In the third sentence of that paragraph, the Supply Agreement refers to the "Products" listed on Exhibit A: "Sherwin-Williams hereby agrees to sell to Customer the paints, coatings, and related products that are set forth on Exhibit A (collectively referred to herein as the 'Products')."  (ECF No. 25-1, PageID #232.)  This language contradicts the earlier reference to Benedettini purchasing "its requirements for all paints, coatings, and related products."  (*Id.*)  Based on this competing language, the parties dispute whether the Supply Agreement governs all sales or only sales of the "Products."  If the latter, the parties also dispute whether the agreement lists UV 257 on Exhibit A.  (*Id.*, PageID #235.)

For these reasons, review of the 2017 Supply Agreement shows disputes of fact that require resolution before the Court can determine whether it governs the sale of UV 257 to Benedettini.  Therefore, to the extent Defendant's arguments for dismissal or judgment on the pleadings of Counts One, Two, and Three rely on the terms of the Supply Agreement, they are not well taken at this stage of the proceedings.

11

### I.C.    Economic Loss Rule

Sherwin-Williams also argues that the economic loss rule bars Plaintiff's tort claims in Counts One and Two.  (ECF No. 34-1, PageID #432–33.)  "The economic-loss rule generally prevents recovery in tort of damages for purely economic loss." *Corporex Dev. & Constr. Mgmt. v. Shook, Inc.*, 106 Ohio St. 3d 412, 2005-Ohio-5409, 835 N.E.2d 701, ¶ 6.  The doctrine polices the boundary between tort and contract law.  "Tort law is not designed to compensate parties for losses suffered as a result of a breach of duties assumed only by agreement." *Id.* (cleaned up).  Where the parties have an agreement, the damages contemplated "remain[] the particular province of the law of contracts." *Id.* (cleaned up).  In other words, "[w]hen a duty in tort exists, a party may recover in tort.  When a duty is premised entirely upon the terms of a contract, a party may recover based upon breach of contract." *Id.*, ¶ 10.

Plaintiff seeks actual damages and costs it incurred repairing the cabinets of customers who experienced frosting.  (ECF No. 19, ¶ 31, PageID #149; *see also id.*, PageID #155.)  As discussed above, disputes of fact remain about application of the 2017 Supply Agreement.  Therefore, it is unclear at this stage of the proceedings whether the damages Plaintiff seeks represent only the "benefit of the bargain," *McCarthy, Lebit, Crystal & Haiman Co., L.P.A. v. First Union Mgmt., Inc.*, 87 Ohio App. 3d 613, 629–30, 622 N.E.2d 1093, 1104 (Ohio Ct. App. 1993), or include additional damages based only on allegedly tortious conduct.  Sherwin-Williams might discover further information to support its argument that the economic loss rule applies.  At the pleading stage, however, the Court cannot so determine.  Because

application of the rule is unclear at this stage of the proceedings, the Court need not rule on Plaintiff's specific arguments and expresses no opinion about them.

## II. Fraudulent Inducement

Benedettini alleges that representatives of Sherwin-Williams made false representations to induce Benedettini to purchase UV 257.  (ECF No. 19, ¶¶ 36–42, PageID #150–52.)  Sherwin-Williams seeks dismissal of this claim, arguing that it fails to meet the heightened pleading standard under Rule 9(b) of the Federal Rules of Civil Procedure and otherwise fails to plead the elements of fraud.  (ECF No. 34-1, PageID #434–40.)

To state a claim for fraudulent inducement, a plaintiff must allege:  (1) a false representation concerning a fact or concealment of a material fact where there is a duty to disclose; (2) knowledge of the falsity of the representation or utter disregard for its truth; (3) intent to induce reliance on the representation; (4) justifiable reliance on the representation; and (5) injury proximately caused by the reliance.  *Micrel, Inc. v. TRW, Inc.*, 486 F.3d 866, 874 (6th Cir. 2007) (citations omitted).

Claims for fraud, including for fraudulent inducement, must meet the heightened pleading standard of Rule 9(b).  That Rule requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  To satisfy the Rule, "a plaintiff must (1) specify the allegedly fraudulent statements, (2) identify the speaker, (3) state when and where the statements were made, and (4) explain what made the statements fraudulent."  *Newberry v. Silverman*, 789 F.3d 636, 645 (6th Cir. 2015) (quoting *Republic Bank & Trust Co. v. Bear Stearns & Co., Inc.*, 683 F.3d 239, 247 (6th Cir. 2012)) (internal quotations

13

omitted). But "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

## II.A. Particularity

Plaintiff identifies five allegedly fraudulent representations. The Court evaluates each in turn.

### II.A.1. Comparison to Valspar UV Coating

Benedettini alleges that, from May 2017 through November 2017, one of several Sherwin-Williams employees made various statements to Bible, Benedettini, and other Benedettini employees concerning UV 257's performance capabilities, including that Sherwin-Williams could provide the Valspar coating or coating with the same performance and durability. (ECF No. 19, ¶¶ 14 & 37(a), PageID #144–45 & #150.) Benedettini alleges that in early June 2017 when Sherwin-Williams "descended on Benedettini's factory," Sherwin-Williams "claimed to have replicated the performance aspects of the Valspar UV coating." (*Id.*, ¶ 15, PageID #145.)

These allegations do not meet Rule 9(b)'s pleading standard. Benedettini must "identify the speaker." *Newberry*, 789 F.3d at 645. But Benedettini does not identify a speaker in Paragraph 15 and lists six possible speakers in Paragraphs 14 and 37 but does not attribute any statement to anyone in particular. Benedettini's allegation that one of six people made an allegedly fraudulent assertion is not sufficiently particularized. Therefore, these representations cannot provide the basis for a claim of fraudulent inducement.

14

### II.A.2. Formulation of UV 257

Benedettini alleges that in October 2017, when a team of Sherwin-Williams laboratory technicians, salespeople, and service representatives were at Benedettini's factory, "Sherwin-Williams also represented to Benedettini that . . . [UV 257] was chemically 'tweaked' to meet Benedettini's performance requirements" and that Sherwin-Williams executive Dennis Karnstein made "the same promises and assurances" on or about October 10, 2017. (*Id.*, ¶¶ 17, 18 & 19, PageID #145–46.) According to Benedettini, because Sherwin-Williams is a large, respected manufacturer, it relied on this representation to mean that the coating was tweaked to be comparable to the Valspar coating in performance and durability and was suitable for use in the Gulf South. (*Id.*, ¶ 18, PageID #146.) Benedettini alleges that these representations were false because UV 257 was not suitable for use in the Gulf South or on light stains, two of Benedettini's performance requirements. (*Id.*, ¶ 38, PageID #151.)

Benedettini's allegation about this alleged statement of Karnstein is sufficiently particular under Rule 9(b). It identifies the statement, the speaker, a location, and an approximate date. Therefore, this allegation can support a claim for fraudulent inducement at the pleadings stage.

### II.A.3. Suitability for Humid Climates

Plaintiff alleges that, from May 2017 through November 2017, one of six Sherwin-Williams employees made various statements to Bible, Benedettini, and other Benedettini employees representing that UV 257 was suitable for use in humid climates like the Gulf South, where Benedettini operates. (*Id.*, ¶ 37(b), PageID #150.)

15

As with the allegation concerning the comparison of UV 257 to Valspar, Benedettini does not attribute this allegation to any specific speaker.  Further, nowhere in the amended complaint does Benedettini indicate a particular instance when a Sherwin-Williams employee made this representation.  The amended complaint appears to invite an inference that because Sherwin-Williams knew that Benedettini operated in the Gulf South, it knew that UV 257 would have to be suitable for use in that region when it said the formula had been tweaked for Benedettini.  Inferences in a plaintiff's favor are appropriate at this stage of the proceedings.  *Anders*, 984 F.3d at 1174.  But an inference does not substitute for a plaintiff's obligation to plead fraud with particularity under Rule 9(b).  Therefore, this allegation cannot support Benedettini's claim for fraudulent inducement.

### II.A.4. Suitability for Light Finishes

In about the same six-month period in 2017, Benedettini alleges that one of six Sherwin-Williams employees represented to Bible, Benedettini, and other Benedettini employees that UV 257 was suitable for use on light finishes and stains. (*Id.*, ¶ 37(c), PageID #150.)  Plaintiff alleges that these representations were false because in 2021, after Benedettini and Sherwin-Williams started investigating the frosting issue, Sherwin-Williams representative Portwood told Bible that UV 257 was not intended for light-stained wood. (*Id.*, ¶ 30, PageID #149.)

Nowhere in the amended complaint does Benedettini allege a specific statement by a specific representative of Sherwin-Williams that UV 257 is suitable for light finishes.  Again, Benedettini fails to "identify the speaker." *Newberry*, 789 F.3d at 645.  Portwood's 2021 statement to Bible is sufficiently particular.  But

Benedettini alleges that this statement was true.  Plaintiff uses it to support the allegation that the prior representations of Sherwin-Williams were false.  However, no other statement pled with particularity forms the basis for Benedettini's fraudulent inducement claim.  The allegation of a later statement, pled with the requisite particularity, cannot save the deficient pleading of allegedly fraudulent statements dating from years earlier.  Therefore, these allegations cannot support Benedettini's claim for fraudulent inducement.

### II.A.5. Other Customers

In March 2021, after Benedettini's customers reported frosting on their cabinets, a representative of Sherwin-Williams, Kevin LaFavers, allegedly told Benedettini's plant manager, Kevin Roach, that "many other customers" used UV 257 without issue.  (*Id.*, ¶ 27, PageID #148.)  Plaintiff alleges that this statement was false because at least one other customer experienced frosting with UV 257.  (*Id.*, ¶ 38(d), PageID #151.)

This allegation cannot support Benedettini's fraudulent inducement claim for two reasons.  First, Benedettini's own allegations contradict the alleged falsity of LaFavers's assertion.  In Paragraph 38, Benedettini alleges for the first time that one other customer experienced frosting using UV 257.  (*Id.*)  LaFavers said many other customers used UV 257 without issue.  Benedettini's allegation that one customer experienced issues does not allege with particularity that this statement was false.

Second, LaFavers made this statement in 2021.  Benedettini alleges that it relied on these false statements in purchasing UV 257 as a replacement for the Valspar coating.  According to the amended complaint, Benedettini made that

decision in 2017. (*Id.*, ¶ 20, PageID #146–47.) LaFavers's 2021 statement could not have induced Benedettini to agree to purchase UV 257 four years earlier in 2017. This statement may be relevant to the timeliness argument Sherwin-Williams makes concerning Benedettini's claim for negligent misrepresentation, but it cannot form the basis for a claim for fraudulent inducement.

## II.B.   Remaining Elements of Fraud

The amended complaint includes a particular allegation that Sherwin-Williams executive Dennis Karnstein represented that Sherwin-Williams tweaked the UV 257 formula to meet Benedettini's performance needs. (ECF No. 19, ¶¶ 18, 19 & 37, PageID #146 & #150.) Therefore, the Court considers whether Plaintiff adequately pleads the other elements of a claim for fraudulent inducement. In doing so, it limits the analysis to the arguments that Sherwin-Williams makes.

### 1.

First, Sherwin-Williams argues that Karnstein's misrepresentation, like all those alleged in the amended complaint, are immaterial statements of opinion concerning future performance, not misrepresentations of fact. (ECF No. 34-1, PageID #435–37.) As to Karnstein's alleged statement, this argument is unavailing. As alleged, that statement referred to actions Sherwin-Williams had already taken to develop a UV coating that met Benedettini's needs. And he made the statement in October 2017, at the end of Sherwin-Williams's second round of testing at Benedettini's plant, the results of which "appeared to be impressive." (ECF No. 19, ¶ 17, PageID #145.) Contrary to Sherwin-Williams's argument that the statement "promised future performance of a product to be developed or still in development,"

18

at this time UV 257 had already been developed over several months and Benedettini would agree to purchase the product within a month. (ECF No. 34-1, PageID #436; ECF No. 25-1.) Benedettini claims it inferred certain performance capabilities based on the representation. But it was not, as Sherwin-Williams argues, a "predictive opinion." (ECF No. 34-1, PageID #437.)

2.

Second, Sherwin-Williams argues that Benedettini's allegations of knowledge and fraudulent intent are conclusory. (*Id.*, PageID #437–39.) Benedettini alleges that Sherwin-Williams's desire to secure its business motivated the fraudulent statements that Sherwin-Williams allegedly made. (ECF No. 19, ¶ 40, PageID #151.) Sherwin-Williams points to several out-of-circuit securities cases to support the argument that a purely financial motive is not enough to plead fraudulent intent. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994) (affirming dismissal because executives are presumably motivated by self-interest in keeping positions so that motive alone is insufficient to plead intent); *Melder v. Morris*, 27 F.3d 1097, 1102–03 (5th Cir. 1994) (affirming dismissal because the lone allegation that defendants were motivated by incentive compensation "would effectively eliminate the state of mind requirement as to all corporate officers"). Further, Sherwin-Williams argues that lying to convince Benedettini to purchase a product it knew was defective would be an irrational means of gaining Benedettini's exclusive business. (ECF No. 34-1, PageID #438.)

Unlike the corporate executives in *Shields* and *Melder*, Karnstein is not a defendant in this case and allegedly made a representation specifically to

Benedettini, not to the market.  Certainly, he might have had incentives based on obtaining business for Sherwin-Williams with Benedettini.  But the cases on which Sherwin-Williams relies for a blanket rule that financial motive alone does not suffice are particular to the facts and circumstances of those securities fraud cases.

Additionally, the argument that misrepresenting UV 257's performance runs counter to business interests of Sherwin-Williams does not carry the day at the pleading stage.  Benedettini alleges that Sherwin-Williams misrepresented UV 257's capabilities to hide a latent defect.  (ECF No. 19, ¶ 33, PageID #149.)  Taking all inferences in favor of Benedettini as the non-moving party, Sherwin-Williams could have engaged in fraud to secure Benedettini's business and relied on the latent nature of the defect to fix the problem later while retaining Benedettini as a customer.  For example, Sherwin-Williams could tweak UV 257 again or suggest another product— which it did.  (*Id.*, ¶¶ 28 & 29, PageID #148.)  Discovery might tend to prove or disprove such claims.

### 3.

Third, Sherwin-Williams argues that Benedettini has not alleged reliance on Karnstein's alleged misrepresentations for two reasons:  (1) the Supply Agreement affirmatively negates reliance by disclaiming all warranties, and (2) Benedettini did not award Sherwin-Williams its business until it saw the "impressive" test results.  (ECF No. 34-1, PageID #439–40.)  As the Court already determined, at this stage of the pleadings, the 2017 Supply Agreement fails to limit Benedettini to the remedies provided in the contract.

Sherwin-Williams cites *Davis v. Montenery*, 173 Ohio App. 3d 740, 2007-Ohio-6221, 880 N.E.2d 488, ¶ 73 (Ohio Ct. App.), to argue that, where a plaintiff did not in fact rely on the alleged misrepresentation, the reliance element is not satisfied.  (ECF No. 34-1, PageID #439.)  In *Davis*, the plaintiff admitted during his deposition that he had asked a third party about the veracity of defendant's representation—he did not rely on the representation itself.  *Davis*, 2007-Ohio-6221, at ¶¶ 62–72.  Tellingly, *Davis* was decided at the summary-judgment stage, and Benedettini made no similar admission in its pleadings.  Benedettini alleges that Sherwin-Williams "took over" its supply line to formulate UV 257 for its needs and cites Karnstein's representations about that formulation to support its reliance.  (ECF No. 19, ¶¶ 15 & 17, PageID #145–46; ECF No. 37, PageID #482–83.)  These allegations are sufficient to plead the reliance element of a claim for fraudulent inducement.

\*       \*       \*

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's motion to dismiss Count One.  Benedettini states a claim for fraudulent inducement based on Karnstein's alleged misrepresentation.

### III.  Negligent Misrepresentation

To state a claim for negligent misrepresentation, a plaintiff must allege: (1) the defendant, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest; (2) supplies false information; (3) for the guidance of others in their business transactions; (4) where those others experience pecuniary loss caused by justifiable reliance on that information; (5) and he fails to exercise reasonable care or competence in obtaining or communicating the

information.  *Abboud v. Liberty Mut. Ins. Grp., Inc.*, 711 F. App'x 773, 777 (6th Cir. 2017) (quoting *Delman v. City of Cleveland Heights*, 41 Ohio St.3d 1, 4, 534 N.E.2d 835, 838 (1989)).

Sherwin-Williams argues that Benedettini's claim for negligent misrepresentation fails as a matter of law because (1) the claim is time-barred, (2) there is no special, fiduciary relationship between the parties, and (3) the amended complaint does not plead a lack of reasonable care.  (ECF No. 34-1, PageID #440–44.)  In opposition, Benedettini argues that a fiduciary relationship is not an element of the tort and that it otherwise pleads the elements of the cause of action. (ECF No. 37, PageID #483–88.)  Also, Plaintiff argues that the fraudulent concealment doctrine tolls the limitations period.  (ECF No. 37, PageID #488–90.)

### III.A. Timeliness

Under Ohio law, a four-year statute of limitations applies to a claim for negligent misrepresentation.  Ohio Rev. Code § 2305.09.  The statute of limitations begins to run when the defendant engages in allegedly tortious activity, even where "the actual injury is subsequent."  *LGR Realty, Inc. v. Frank & London Ins. Agency*, 152 Ohio St. 3d 517, 2018-Ohio-334, 98 N.E.3d 241, ¶ 14 (quoting *Kerns v. Schoonmaker*, 4 Ohio 331, syllabus (1831)).  "Under the fraudulent concealment doctrine, a statute of limitations may be tolled 'where there is some conduct of the adverse party, such as misrepresentation, which excludes suspicion and prevents inquiry.'"  *Lutz v. Chesapeake Appalachia, LLC*, 717 F.3d 459, 474 (6th Cir. 2013) (quoting *Bryant v. Doe*, 50 Ohio App. 3d 19, 552 N.E.2d 671, 675 (Ohio Ct. App. 1988)). The elements of fraudulent concealment are:

22

> (1) wrongful concealment of their actions by the defendant[]; (2) failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the limitations period; and (3) plaintiff's due diligence.

*Id.* at 475 (quoting *Dayco Corp. v. Goodyear Tire & Rubber, Co.*, 523 F.2d 389, 394 (6th Cir. 1975)).

According to Benedettini, Sherwin-Williams misrepresented that UV 257's performance was comparable to the Valspar coating, that UV 257 was suitable for the humid climate where Benedettini operates, that UV 257 could be used on light finishes, and that many other customers used UV 257 without issue. (ECF No. 19, ¶ 45, PageID #152.) The gravamen of these allegations is that, "[f]or four years, Benedettini followed instructions from Sherwin-Williams that Sherwin-Williams knew were faulty." (ECF No. 37, PageID #489.) The alleged tortious conduct underlying Benedettini's claim occurred between May and November 2017, and Benedettini alleges that it relied on Sherwin-Williams's misrepresentations when it agreed to purchase UV 257 to fulfill its UV coating needs in November 2017. Therefore, absent tolling, the statute of limitations on Benedettini's claim for negligent misrepresentation ran in November 2021, months before Benedettini filed suit in May 2022.

Benedettini argues that it did not, and could not have, discovered the latent frosting defect before May 2020 when the issue appeared. At that time, Benedettini's tort claim would have been within the statute of limitations. However, around that time Sherwin-Williams's represented that a neighboring chemical plant caused the issue (ECF No. 19, ¶ 24, PageID #147–48), and LaFavers asserted that "many other

23

customers" used UV 257 without issue. (*Id.*, ¶ 27, PageID #148).  According to Benedettini, these statements concealed the fact that "[t]he true problem was with Sherwin-Williams's product."  (ECF No. 37, PageID #489.)  Benedettini does not argue that these statements start the limitations period anew, but it does note that its argument "assum[es] that none of Sherwin-Williams's statements from 2020 and 2021 are independently actionable."  (ECF No. 37, PageID #490.)

When Sherwin-Williams first pointed to Benedettini's neighbor as the cause of the frosting sometime between May 2020 and March 2021, the statute of limitations had not yet run.  (ECF No. 19, ¶¶ 24 & 25, PageID #147–48.)  For this reason, Sherwin-Williams argues that Benedettini cannot rely on fraudulent concealment to save its claims because there were sufficient indicia that something was wrong with UV 257 as early as May 2020.  On this theory, Benedettini had a duty to inquire and could not rely on Sherwin-Williams's "efforts . . . to lull it into a false sense of security."  *Zemcik v. LaPine Truck Sales & Equip. Co.*, 124 Ohio App. 3d 581, 706 N.E.2d 860, 865 (Ohio Ct. App. 1998) (quoting *Au Rustproofing Center, Inc. v. Gulf Oil Corp.*, 755 F.2d 1231, 1237 (6th Cir. 1985)).  But Benedettini discovered the existence of the frosting defect at that time, and both parties were actively investigating the issue, according to the pleadings.  What remained unknown was the cause of the alleged defect.  Construing the facts in Benedettini's favor, as the Court must in the present procedural posture, this set of facts might plausibly have diverted Benedettini from identifying the true cause of the frosting for at least the six months

by which its claim is otherwise untimely.  Discovery might show otherwise, but at this stage the Court cannot say the claim is untimely as a matter of law.

### III.B. Special Relationship

Sherwin-Williams argues that Plaintiff cannot state a claim for negligent misrepresentation because the parties were not in a special fiduciary relationship. (ECF No. 34-1, PageID #440–42.)

### III.B.1. Availability of Claim as a Matter of Law

As Plaintiff notes, a "special relationship" is not a separate element of negligent misrepresentation. *Abboud*, 711 F. App'x at 777; *see also* Restatement (Second) of Torts, § 552(1).  Instead, the Ohio Supreme Court interprets the requirement that a defendant supplied information for a plaintiff's "guidance in their business transactions" to mean that the plaintiff must be a member of a limited class of people who foreseeably rely on the defendant's representations. *Haddon View Inv. Co. v. Coopers & Lybrand*, 70 Ohio St. 2d 154, 157, 436 N.E.2d 212, 214–15 (1982). Usually, this situation arises where a defendant is a professional, such as an accountant, who is "in the business of rendering opinions to others for their use in guiding their business." *Picker Int'l, Inc. v. Mayo Found.*, 6 F. Supp. 2d 685, 689 (N.D. Ohio 1998.)

Under Ohio law, the determinative question is whether the plaintiff belongs to a "faceless or unresolved class of persons" or "a known group possessed of vested rights, marked by a definable limit and made up of certain components." *Haddon View*, 70 Ohio St. 2d at 156 (quoting *White v. Guarente*, 43 N.Y.2d 356, 361, 372 N.E.2d 315, 319 (1977)).  Those who speak "in the course of [their] business,

profession or employment, or in any other transaction in which [they have] a pecuniary interest" have a duty only to the latter.  *Abboud*, 711 F. App'x at 777 (quoting *Delman*, 41 Ohio St. 3d at 4).

Most recently, the Sixth Circuit addressed this tort under Ohio law in *Ohio Police & Fire Pension Fund v. Standard & Poor's Financial Services LLC*, 700 F.3d 829 (6th Cir. 2012), a State-law securities case that also included a claim for negligent misrepresentation.  There, investment banks paid the defendant a fee to assess the risk of certain mortgage-backed securities, but the defendant only earned its fee if it issued the desired rating.  *Id.* at 833–34.  The court concluded that the plaintiff—a fund that purchased mortgage-backed securities and experienced losses related to the 2008 financial crisis—was part of the faceless investing public and not a "limited class" as Ohio law requires.  *Id.* at 841.  Under this standard, a simple consumer transaction will generally not satisfy the requirement for a special relationship, either.  *See Meta v. Target Corp.*, 74 F. Supp. 3d 858, 865 (N.D. Ohio 2015); *Miller v. Kent Nutrition Grp.*, No. 1:15-cv-2116, 2016 WL 11246420, at *9–10 (N.D. Ohio Sept. 16, 2016).

Sherwin-Williams argues that the same is true of arm's-length business transactions.  (ECF No. 34-1, PageID #441.)  On this point, courts disagree.  In *Picker*, the court granted summary judgment and dismissed a negligent representation claim because "[t]his 'special' relationship does not exist in ordinary business transactions." 6 F. Supp. 2d at 689 (citing *Haddon View*, 70 Ohio St. 2d at 157).  The Northern District of Ohio has relied on this proposition in other cases.  *See Ziegler v. Findlay*

26

*Indus., Inc.*, 464 F. Supp. 2d 733, 738 (N.D. Ohio 2006); *see also Premier Bus. Grp., LLC v. Red Bull of N. Am., Inc.*, No. 08-cv-1453, 2009 WL 3242050, at *10–11 (N.D. Ohio Sept. 30, 2009); *Cuyahoga Metro. Hous. Auth. v. 10-8 Sys., Inc.*, No. 1:05-cv-0980, 2006 WL 543103, at *5 (N.D. Ohio Mar. 2, 2006); *Hayes v. Computer Assocs. Int'l, Inc.*, No. 3:02-cv-7452, 2003 WL 21478930, at *6–7 (N.D. Ohio June 24, 2003). However, other courts question this view. *Pacifica Loan Five, LLC v. Fifth Third Bank*, No. 1:09-cv-930, 2011 WL 13228111, at *11 (S.D. Ohio Apr. 14, 2011) (characterizing *Picker*'s proposition that a special relationship does not exist in arm's-length business transactions as "flatly incorrect," and "those cases directly and indirectly relying on *Picker*" as "incorrect as well").

Further, in a recent case that Plaintiff cites, the Southern District of Ohio concluded that the buyer in a business-to-business transaction involving software stated a claim for negligent misrepresentation against the seller. *Crooksville Fam. Clinic v. Quest Diagnostics, Inc.*, No. 2:16-cv-1145, 2019 WL 6715941, at *12 (S.D. Ohio Dec. 10, 2019). There, the software could not perform the functions the buyer needed, contrary to the seller's specific representations. *Id.* at *2–4. This decision is consistent with a handful of other cases in the Southern District of Ohio. *See Pacifica*, 2011 WL 13228111, at *11; *National Mulch & Seed, Inc. v. Rexius Forest By-Prods. Inc.*, No. 2:02-CV-1288, 2007 WL 894833, at *9 (S.D. Ohio Mar. 22, 2007).

Notably, the Ohio Supreme Court employs the economic loss doctrine to tie the availability of a claim for negligent misrepresentation to the viability of a non-contractual claim. *See Corporex Dev. & Constr. Mgmt.*, 2005-Ohio-5409, at ¶¶ 9–10

27

(discussing *Haddon View*, 70 Ohio St. 2d at 156). That is, where a defendant has a separate duty in tort by virtue of a special or fiduciary relationship to a limited class of people, then the economic loss rule does not apply because the defendant allegedly breached two separate duties—one in contract and one in tort. *Id.* at ¶ 10. In this way, Ohio law uses the economic loss rule to police the boundary between contract and tort when it comes to a claim for negligent misrepresentation.

Consistent with this view of the Ohio Supreme Court, the Court does not read Ohio law to impose a duty in tort on every party to an arm's-length commercial transaction who communicates with its counterpart about a product or service at issue. Ordinarily, buyers and sellers have a contract. And sellers make statements about their products and services. Where products and services do not perform consistent with those statements, a buyer typically has a warranty or other contractual remedy. To impose a separate duty in tort any time a seller makes a statement would blur the line between contract and tort, and the Ohio Supreme Court recognizes that such liability extends only to special cases. *Gutter v. Dow Jones, Inc.*, 22 Ohio St. 3d 286, 288–89, 490 N.E.2d 898, 900 (1986).

### III.B.2. Application to the Alleged Facts

Against this background, the Court examines the facts and circumstances alleged here, which involve two sophisticated parties—one of the largest suppliers of paints and coatings in the country and a successful regional cabinet manufacturer that has operated for at least twenty years. Under Ohio law, "[w]hen a duty in tort exists, a party may recover in tort. When a duty is premised entirely upon the terms of a contract, a party may recover based upon breach of contract." *Corporex Dev. &*

*Constr. Mgmt.*, 2005-Ohio-5409, at ¶ 10.  In the present procedural posture, this legal standard begs the question.  That is, if the 2017 Supply Agreement governs the parties' relationship, then any remedy Benedettini has lies in contract.  But factual disputes prevent resolution of that question at this time, and Plaintiff may plead in the alternative.

Nor can the Court say as a matter of law that the particular facts and circumstances alleged, construed in Benedettini's favor, otherwise require dismissal of this claim.  As relevant to the parties' arguments, stating a claim requires pleading that, in the course of its business, the defendant supplied false information for the guidance of others in their business transactions.  Without question, Sherwin-Williams is not in the business or profession of supplying information to others.  It is in the business of selling paints and coatings.  (ECF No. 19, ¶ 5, PageID #142.)  But in the course of that business, it supplied allegedly false information to Benedettini knowing that Benedettini intended to rely on it.

As for the determinative question under Ohio law, whether the plaintiff belongs to a "faceless or unresolved class of persons" or "a known group possessed of vested rights, marked by a definable limit and made up of certain components," *Haddon View*, 70 Ohio St. 2d at 156 (quoting *White*, 43 N.Y.2d at 361), Sherwin-Williams allegedly made specific representations to Benedettini in response to complaints it received from its customers—not generic statements to the market or another amorphous group.  If tort law supplies a remedy in this case, the allegations of the amended complaint show that Sherwin-Williams undertook a duty to speak

29

and contend that it did so negligently. Ultimately, the availability and viability of Benedettini's claim for negligent misrepresentation turns on resolution of the parties' dispute about the applicability of the 2017 Supply Agreement and, if applicable, further factual development.

### III.C. Reasonable Care

Sherwin-Williams also argues that the amended complaint does not contain plausible allegations that Sherwin-Williams failed to exercise reasonable care. (ECF No. 34-1, PageID #442.) Benedettini focuses on information that Sherwin-Williams provided relating to UV 257's performance, suitability for humid climates, and suitability for light finishes. (ECF No. 19, ¶¶ 45–46, PageID #152–53.) A defendant may be liable for negligence where he or she "fails to exercise reasonable care or competence in obtaining or communicating . . . information." *Delman*, 41 Ohio St. 3d at 4. "[U]nless the facts are so clear as to permit only one conclusion," this question is one for the jury. Restatement (Second) of Torts, § 552, cmt. e. Based on the allegations in the amended complaint, construed in Benedettini's favor, the Court cannot say that the facts are so clear that Sherwin-Williams exercised reasonable care in its statements concerning UV 257's performance that it can resolve the question at the pleading stage.

### CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's motion for judgment on the pleadings. The Court **DISMISSES** Count One except as to Karnstein's representation on or about October 10, 2017 and otherwise **DENIES** the motion.

30

**SO ORDERED.**

Dated:  September 27, 2023

_____
J. Philip Calabrese
United States District Judge
Northern District of Ohio