## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| BENEDETTINI CABINETS, L.P., | ) | Case No. 1:22-cv-00737 |
| | ) | |
| Plaintiff and | ) | Judge J. Philip Calabrese |
| Counter-Defendant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SHERWIN-WILLIAMS CO., | ) | |
| | ) | |
| Defendant and | ) | |
| Counter-Claimant. | ) | |
| | ) | |

## <u>OPINION AND ORDER</u>

Governmental intervention in the market works unintended consequences.  In 2017, Sherwin-Williams acquired Valspar, a competitor in the market for paint and coatings.  To obtain approval for the acquisition from federal competition authorities, in this case the Federal Trade Commission, Sherwin-Williams divested from certain Valspar businesses as part of the transaction.  At the time, Benedettini Cabinets, a cabinetmaker outside Houston, used Valspar coatings.  When Sherwin-Williams acquired Valspar, the required divestiture resulted in a spin-off of Benedettini's supplier, and Sherwin-Williams sought to win Benedettini's business nonetheless.  Notwithstanding the price regulators exacted for the merger, the market sought efficiencies all the same.

Ultimately, Sherwin-Williams and Benedettini entered into a supply agreement for Benedettini's business.  That agreement limits the liability of Sherwin-Williams and disclaims various warranties.  One of the coatings Sherwin-Williams

sold (UV 257), Benedettini alleges, was defective because over time it produced frost, described as a white, hazy deposit on the surface of cabinets, requiring replacement at considerable cost.  Because of this alleged defect, Benedettini sued Sherwin-Williams, which counterclaimed.  After much discovery, the parties filed cross-motions for summary judgment on the key questions regarding the contract's application to this dispute.

## STATEMENT OF FACTS

Without question, the parties have a supply agreement.  (ECF No. 29-1.)  That agreement was in effect from November 1, 2017 to October 31, 2022.  (*Id.*, ¶ 1, PageID #329.)  Later, the parties extended it through January 2023.  (ECF No. 59-7, PageID #663.)  By its terms, the supply agreement applies to certain products.  Paragraph 2 reads:

> During the Term of this Agreement, Customer shall utilize Sherwin-Williams as Customer's supplier for paints, coatings, and related products utilized by Customer.  Specifically, Customer shall purchase its requirements for all paints, coatings, and related products from Sherwin-Williams.  Upon receipt of a purchase order from Customer, Sherwin-Williams hereby agrees to sell to Customer the paints, coatings, and related products that are set forth on Exhibit A (collectively referred to herein as the "Products").

(ECF No. 29-1, ¶ 2, PageID #329.)  Exhibit A to the supply agreement lists seven products, one of which is HG1516V86, described as ".78 VOC Clear Solvent UV."  (*Id.*, PageID #332.)  Paragraph 10 of the supply agreement, titled Representations and Warranties, limited the warranties Sherwin-Williams provided only to certain manufacturing defects and limits its liability.  That provision reads:

> Sherwin-Williams represents and warrants to Customer that all Products sold by Sherwin-Williams to Customer shall be free of manufacturing defect in

accordance with the Sherwin-Williams quality control specifications in effect at the time of manufacturing.  EXCEPT FOR THE FOREGOING, SHERWIN-WILLIAMS DISCLAIMS ALL WARRANTIES ARISING OUT OF THE SALE OF PRODUCTS UNDER THIS AGREEMENT, OF ANY KIND, EXPRESS OR IMPLIED, ORAL OR WRITTEN, INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTY OF MERCHANTABILITY AND THE IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE.  IN NO EVENT SHALL SHERWIN-WILLIAMS BE LIABLE FOR SPECIAL, INDIRECT, INCIDENTAL, OR CONSEQUENTIAL DAMAGES TO CUSTOMER OR TO ANY THIRD PARTY CLAIMING BY OR THROUGH CUSTOMER.  IN NO EVENT SHALL SHERWIN-WILLIAMS LIABILITY TO CUSTOMER EXCEED SHERWIN-WILLIAMS' AGGREGATE NET AMOUNT OF PRODUCTS PAID FOR BY CUSTOMER DURING THE TERM OF THIS AGREEMENT.

(*Id.*, ¶ 10, PageID #330.)  This brief overview of the contract sets the stage for the disputes that the parties litigate in their cross-motions for summary judgment.

If the particular coating at issue is listed on Exhibit A, then the analysis shifts to applying Paragraph 10 of the contract.  For this reason, at the outset of the case, the Court pushed the parties to present the contract issues in dispute through an agreed record or one framed with limited discovery.  Eventually, the parties persuaded the Court that such an approach would not work in this case.  As the record and the parties' arguments show, the parties agree on little else.  For example, the parties dispute whether Exhibit A lists the coating at issue and other basic facts that drive the legal analysis.  (*See, e.g.*, ECF No. 64-1, PageID #1140; ECF No. 69-1, PageID #2720–21.)

In the current procedural posture, the Court construes the facts in Plaintiff's favor in ruling on Defendant's motion for summary judgment on the contract defenses it presents, and in Defendant's favor in ruling on Plaintiff's motion for summary judgment on the counterclaim for a declaratory judgment.  Where the record presents

3

material disputes or competing versions of the facts, the Court so notes.  The record establishes the following facts relevant to resolving the pending cross-motions.  The Court does not wade further into the record than that.

### A.    Initial Negotiations

Benedettini Cabinets produces residential cabinets primarily for sale in Texas and the surrounding Gulf South region.  (ECF No. 19, ¶ 5, PageID #142.) Headquartered in Cleveland, Ohio, Sherwin-Williams is a manufacturer of paints and coatings.  (*Id.*, ¶¶ 4–5, PageID #142; ECF No. 29, ¶ 3, PageID #317.)  Before 2017, Benedettini purchased from Valspar most of the cabinetmaker's needed ultraviolet coatings, a clear compound applied wet then dried with ultraviolet light.  (ECF No. 19, ¶¶ 7–8, PageID #143; ECF No. 29, ¶ 7, PageID #318.)

### A.1.    Sherwin-Williams Acquires Valspar

In 2016, Sherwin-Williams announced that it reached an agreement to acquire Valspar.  (ECF No. 19, ¶ 10, PageID #143; ECF No. 29, ¶ 8, PageID #318.)  After Benedettini heard this news, its general manager, Matthew Bible, contacted Tim Jones, a sales manager with Sherwin-Williams.  (ECF No. 19, ¶ 10, PageID #143.) Bible sought to ensure that Benedettini could continue to receive the same UV coating after the deal closed.  (*Id.*)  According to Benedettini, Jones "ma[de] a series of promises that Sherwin-Williams would supply a comparable UV coating" to the Valspar coating that Benedettini purchased before the acquisition, even though Sherwin-Williams did not retain that business as part of the transaction.  (*Id.*, ¶ 10, PageID #144.)  Sherwin-Williams claims that Bible promised Jones that Sherwin-

Williams would "obtain 100 percent of Benedettini's business and finishing products" if it produced a comparable UV coating.  (ECF No. 63, PageID #905–07.)

When Sherwin-Williams acquired Valspar in 2017, the Valspar UV coating division was spun off to another company.  (ECF No. 19, ¶ 11, PageID #144; ECF No. 29, ¶ 9, PageID #318.)  This occurred following a Federal Trade Commission investigation in which Sherwin-Williams agreed to sell to Axalta Coating Systems Ltd. Valspar's North America Industrial Wood Coatings Business.  *See In the Matter of the Sherwin-Williams Co., A Corp., & the Valspar Corp., A Corp.*, No. 161-0116, 2017 WL 2362252, at *9 (MSNET May 26, 2017).

According to Sherwin-Williams, Benedettini sought a supply agreement in part because it expected better prices than what it would receive from Valspar after it was spun off.  (ECF No. 29, ¶ 11, PageID #319.)  Specifically, the benefits to Benedettini included price protection and notice of any price increases.  (ECF No. 63-1, PageID #988–89.)  For Benedettini, determinations of pricing and volatile organic compound ("VOC") standards for the UV coating "were critical to that . . . arrangement."  (ECF No. 63, PageID #911.)  Further, Benedettini negotiated with Sherwin-Williams for an up-front payment from Sherwin-Williams of a sales allowance toward expanding its facility and equipment pertaining to "certain transition expenses relating to the use of the Sherwin-Williams Products."  (ECF No. 61-6, PageID #769; ECF No. 63-2, PageID #1028.)  Sherwin-Williams referred to this as a "financial incentive."  (ECF No. 61-6, PageID #769.)  Benedettini provided Sherwin-Williams with spending data on its finishing products demonstrating that a large quantity of its purchases from

5

Valspar in 2016 went toward UV coating products and that Benedettini had used several different finishing products on its cabinets in 2016.  (ECF No. 63, PageID #915; ECF No. 61-5, PageID #766–68; ECF No. 61-7, PageID #770–854.)

### A.2.   Proposed Financial Terms

On August 10, 2017, a sales manager for Sherwin-Williams emailed Benedettini proposed financials terms if Benedettini used Sherwin-Williams's finishing products.  (ECF No. 61-6, PageID #769; ECF No. 63, PageID #918–20.)  Bible testified that, based on his interpretation of the proposed terms, he expected that Benedettini would receive a rebate on all of its purchases from Sherwin-Williams.  (ECF No. 63, PageID #922.)  Further, internal communications at Benedettini show that executives in the company calculated the rebate that it would receive each year with Sherwin-Williams if Benedettini had the same purchase rate as with Valspar.  (ECF No. 61-8, PageID #855.)

On August 17, 2017, Bible and Jones signed a letter of intent, which had identical financial terms to the email of August 10, aside from a higher sales allowance.  (*Compare* ECF No. 61-6, PageID #769 *with* ECF No. 62, PageID #857.)  Bible testified that, based on the terms of the letter of intent, Benedettini would receive a rebate on its purchases from Sherwin-Williams and that it contained no exclusions for any finishing products.  (ECF No. 63, PageID #928–29.)  Further, Bible testified that it "was an awesome benefit" to receive a certain rebate percentage on all of the purchases that Benedettini could and that he expected an annual rebate.  (ECF No. 63-1, PageID #1005.)  During the negotiations that followed, the parties agreed on prices for certain products, including the price for UV 257, which was

agreed to and memorialized in the draft supply agreement.  (ECF No. 63, PageID #931–32; ECF No. 63-1, PageID #1001–02.)

### A.3.  UV 257 Testing

Also in 2017, the parties began testing Sherwin-Williams's UV coatings on cabinets at Benedettini's plant in Texas.  (ECF No. 19, ¶ 15, PageID #145; ECF No. 29, ¶ 12, PageID #319.)  According to Sherwin-Williams, its employees worked with Benedettini to ensure that the UV coatings met Benedettini's performance requirements.  (ECF No. 29, ¶ 12, PageID #319.)  During this time, Sherwin-Williams claims that Benedettini's representatives repeatedly told Sherwin-Williams that, if it could supply a UV coating comparable to Valspar's, Sherwin-Williams would gain its exclusive business.  (ECF No. 19, ¶¶ 12–15, PageID #144–45; ECF No. 29, ¶¶ 12–15, PageID #308–09.)

From May 2017 to November 2017, Benedettini alleges that Jones and Sherwin-Williams representatives Rick Romero, Steve Nicks, Mark Portwood, and Alex Blahnik represented to Bible, Steve Benedettini, and other Benedettini employees that Sherwin-Williams could provide the Valspar coating or a comparable UV coating.  (ECF No. 19, ¶¶ 14, 19 & 37, PageID #144–46 & #150.)  Benedettini argues that Sherwin-Williams could not have affirmatively made this representation because Benedettini was the first customer to which Sherwin-Williams sold its solvent-based UV coating.  (ECF No. 69-1, PageID #2708.)  In support of this argument, it cites testimony from several Sherwin-Williams employees.  (ECF No. 67-4, PageID #1837–38; ECF No. 67-1, PageID #1326; ECF No. 67-2, PageID #1525.)  Nicks testified that "Benedettini was the first solvent-based UV coating that

[Sherwin-Williams] sold . . . in [his] area" of Rosenberg, Texas.  (ECF No. 67-4, PageID #1837–38.)  Portwood testified that Benedettini was the only customer with which Sherwin-Williams had long-term sales of the UV solvent in the 2016 to 2020 time frame.  (ECF No. 67-1, PageID #1326.)  Romero testified that no other Sherwin-Williams customer used the solvent UV product before.  (ECF No. 67-2, PageID #1525.)  Further, Benedettini claims that Sherwin-Williams knew that humidity affected the coating but did not inform Benedettini of these risks based on the testimony of Sherwin-Williams employees that the solvent UV coating was "finicky" and "hard to control."  (ECF No. 69-1, PageID #2708; ECF No. 67-4, PageID #1836–37; ECF No. 67-2, PageID #1460.)

Sherwin-Williams representatives visited Benedettini's plant in 2017 and "took over the UV coating equipment at the factory" to test and tweak the formulas.  (ECF No. 19, ¶ 15, PageID #145; ECF No. 29, ¶ 12, PageID # 319.)  Benedettini alleges that in June 2017, "[a]fter much work, Sherwin-Williams claimed to have replicated the performance aspects of the Valspar UV coating."  (ECF No. 19, ¶ 15, PageID #145.)

In October 2017, Sherwin-Williams conducted a final test, and the "results appeared to be impressive."  (*Id.*, ¶ 17, PageID #145–46.)  The parties disagree on who selected UV 257 as best suited for Benedettini's needs.  (*Id.*; ECF No. 29, ¶ 17, PageID #309.)  Benedettini maintains that Sherwin-Williams selected UV 257.  (ECF No. 19, ¶ 17, PageID #145–46; ECF No. 29, ¶ 14, PageID #319.)  According to Sherwin-Williams, Benedettini "relied upon its own review and inspection of the test

8

results of the finished cabinets in approving and selecting the UV coating." (ECF No. 29, ¶ 14, PageID #319.)

### B.    The Supply Agreement

On October 5, 2017, Sherwin-Williams sent Benedettini a draft supply agreement. (ECF No. 62-1, PageID #858–62.) Bible requested modifications to the pricing for two items on the product list attached to the draft. (ECF No. 63, PageID #930; ECF No. 62-3, PageID #868.) Sherwin-Williams claims that, on October 10, 2017, the parties signed and entered into the supply agreement (ECF No. 60-4, ¶¶ 6–9, PageID #734), which served as a requirements contract pursuant to which Benedettini would purchase the UV coating, as well as "its requirements for all paints, coatings, and related products from Sherwin-Williams" (ECF No. 29, ¶ 18, PageID #320). Benedettini claims that the parties signed the supply agreement later in October 2017 or early November 2017. (ECF No. 63-1, PageID #995.)

### B.1.    The Product List

According to Sherwin-Williams, it assigns "test rex numbers" to products in development and testing. (ECF No. 29, ¶ 15, PageID #320.) These are temporary numbers that Sherwin-Williams replaces with permanent "rex numbers" once a product has been approved for commercial sale. (*Id.*) Sherwin-Williams alleges that it assigned a test rex number of HG1516V86 to the UV coating it developed for Benedettini. (*Id.*) After Benedettini approved the UV coating, Sherwin-Williams claims that it assigned to the UV coating the rex number V86FH0257. (*Id.*) In addition, Sherwin-Williams alleges that it assigned the rex number V86FH0258 to a

9

version of the UV coating to be used as an additive to decrease gloss, and V86CH0003 to a version to be used as an additive to increase gloss. (*Id.*)

Exhibit A to the supply agreement sets out a defined list of products of "[c]ertain paint, coatings, and related products to be purchased by [Benedettini] under the Supply Agreement with agreed upon prices." (*Id.*, ¶ 19, PageID #320; ECF No. 29-1, PageID #332.) Exhibit A identifies the first listed product as "HG1516V86," with a description ".78 VOC Clear Solvent UV." (ECF No. 29, ¶ 19, PageID #320; ECF No. 29-1, PageID #332.) Sherwin-Williams maintains that Mr. Benedettini and Bible knew at the time that the supply agreement was executed that this product covered the UV coating that Sherwin-Williams developed and tested in Benedettini's factory and was later purchased using the rex numbers V86FH0257, V86FH0258, and V86CH0003, which Benedettini disputes. (ECF No. 29, ¶¶ 20–21, PageID #321; ECF No. 33, ¶¶ 20–21, PageID #401.) Further, Sherwin-Williams alleges that Benedettini's purchase price for V86FH0257 "has at all times been determined by [Benedettini] and Sherwin-Williams as the price of HG1516V86 under the Supply Agreement." (ECF No. 29, ¶ 26, PageID #322.) Sherwin-Williams claims that the purchase price for V86FH0257 was the same price as HG1516V86 for the first year of the supply agreement, which Benedettini disputes. (*Id.*, ECF No. 33, ¶ 26, PageID #403.)

Sherwin-Williams argues that Bible and Mr. Benedettini never looked at the product number for the UV coating before signing the supply agreement. (ECF No. 64-1, PageID #1132.) In support, it cites Bible's testimony that his focus was on

10

the pricing listed in supply agreement, not the descriptions. (ECF No. 63, PageID #951–52.) Further, Mr. Benedettini testified that, when he signed the supply agreement, he believed that he was committing Benedettini to buy the UV coating that Benedettini ran and tested. (ECF No. 63-2, PageID #1048–49.) Benedettini acknowledges that the UV coating it purchased from Sherwin-Williams under the number V86FH0257 "is the same UV coating that Sherwin-Williams developed and tested in Benedettini's factory in the fall of 2017," but argues that it was not listed on Exhibit A of the supply agreement. (ECF No. 33, ¶ 24, PageID #402.)

### B.1.a. Alleged Alterations to the UV Coating

On August 25, 2017, Sherwin-Williams created a data sheet noting that the UV coating being developed for Benedettini was assigned a rex number of V86FH0257. (ECF No. 68-1, PageID #2681.) On September 1, 2017, an internal Sherwin-Williams email also used this rex number. (ECF No. 68-2, PageID #2682.) Benedettini argues in its papers that Sherwin-Williams chose not to include the rex number V86FH0257 in the draft supply agreement over a month later even though it had already been assigned. (ECF No. 69-1, PageID #2712; ECF No. 62-1, PageID #862.) Sherwin-Williams employees testified that they did not tell, recall telling, or have knowledge of Benedettini being told about the internal test rex number. (ECF No. 67-4, PageID #1849–50; ECF No. 67-1, PageID #1380–81; ECF No. 67-14, PageID #1954–55; ECF No. 67-2, PageID #1468–69; ECF No. 67-3, PageID #1687; ECF No. 67-15, PageID #2155.)

Benedettini argues that Sherwin-Williams developed a new UV coating after the execution and effective date of the supply agreement that it claims was the UV

coating it developed and tested at Benedettini's facility and unilaterally changed solvent and gloss levels of UV 257 without informing Benedettini. (ECF No. 69-1, PageID #2713.) In support of this claim, Benedettini cites a number of internal Sherwin-Williams emails and documents that indicate the need to modify the UV coating formula in terms of gloss and solvent levels (ECF No. 67-16, PageID #2186; ECF No. 68-3, PageID #2683; ECF No. 67-11, PageID #1939; ECF No. 67-12, PageID #1941; ECF No. 67-20, PageID #2192; ECF No. 67-21, PageID #2196; ECF No. 67-22, PageID #2198; ECF No. 67-23, PageID #2201; ECF No. 67-24, PageID #2204; ECF No. 67-25, PageID #2209; ECF No. 67-26, PageID #2216), a summary of adjustments made during the October test run of the product (ECF No. 62-6, PageID #880; ECF No. 67-17, PageID #2187; ECF No. 67-18, PageID #2189), and the need to update the rex number with test product formulas (ECF No. 67-13, PageID #1942; ECF No. 67-19, PageID #2191).

The claimed modifications resulted in a different test rex number for the UV coating, HG1731V86, which was not listed on Exhibit A to the supply agreement. (ECF No. 67-13, PageID #1942–44.) Sherwin-Williams did not change the permanent rex number. (ECF No. 67-19, PageID #2191.) Sherwin-Williams acknowledges that HG1731V86 was a modified and updated version of the UV coating product. (ECF No. 67-1, PageID #1411.) Further, Benedettini argues that the UV coating that later caused the frosting of its cabinets was the new formula, HG1731V86, but cites nothing in the record to support this claim. (ECF No. 69-1, PageID #2714.)

### B.1.b. The UV Coating Test

On October 19, 2017, Sherwin-Williams emailed Benedettini a list of thirteen products that it would need during the October 23 weeklong UV coating test run at Benedettini's factory. (ECF No. 62-5, PageID #877–78.) Three of those products were V86FH0257, V86FH0258, and V86CH0003, each of which Sherwin-Williams priced at the same amount for UV coating included in the contract. (*Compare* ECF No. 62-1, PageID #862 *with* ECF No. 62-5, PageID #878.) Benedettini ordered the products on the emailed list for the test run. (ECF No. 63, PageID #942.) The parties ran the UV coating at Benedettini's factory during the week of October 23, 2017. (ECF No. 62-6, PageID #879.) Benedettini requested certain modifications and additional testing, which Sherwin-Williams performed. (ECF No. 60-1, PageID #697; ECF No. 19, ¶ 17, PageID #145.)

### B.2. Amendments

In 2020, Benedettini requested a discount from Sherwin-Williams because of Covid-19. (ECF No. 60, PageID #674.) It sent Sherwin-Williams a draft amendment to their agreement which included proposed price lists as exhibits, identifying the UV coating as V86FH0257, but did not suggest revisions to the original Exhibit A. (*Id.*; ECF No. 60-2, PageID #715; ECF No. 62-8, PageID #886–88; ECF No. 62-9, PageID #889–92.) Although the parties did not execute this amendment, Benedettini argues that this draft shows that its inclusion of V86FH0257 confirms that the HG1516V86 product on Exhibit A of the executed supply agreement is not UV 257. (ECF No. 69-1, PageID #2716.)

In 2022, the parties did amend the supply agreement, extending its terms from October 2022 to January 2023. (ECF No. 59-7, PageID #663.) In early summer 2021, Benedettini switched to purchasing new UV coatings from Sherwin-Williams with numbers that were also not listed on Exhibit A. (ECF No. 63-1, PageID #1008.)

### B.3. Exclusivity

On November 2, 2017, Bible emailed a third party and told them that Benedettini was "moving 100% of product" to Sherwin-Williams following the UV coating testing. (ECF No. 59-6, PageID #661.) At oral argument, the parties disputed whether Bible was referring only to Benedettini's equipment, as Benedettini contended, or all of its product, as Sherwin-Williams argued. In any event, since 2017, Benedettini purchased over $5 million worth of UV 257 coating from Sherwin-Williams under "this arrangement" and installed cabinets coated with UV 257 in over two thousand homes in the Gulf South region. (ECF No. 19, ¶¶ 20 & 31, PageID #146–47 & #149.)

In May 2017, Benedettini told Sherwin-Williams that it purchased six figures of acetone in 2016, but the supply agreement does not mention acetone. (ECF No. 61-5, PageID #766; ECF No. 62-1, PageID #858–62.) Benedettini rejected multiple attempts by Sherwin-Williams to sell acetone to it. (ECF No. 67-27, PageID #2218; ECF No. 67-28, PageID #2223; ECF No. 67-29, PageID #2226; ECF No. 67-30, PageID #2227.) Benedettini cites testimony from Rick Romero, an account manager at Sherwin-Williams, to support its contention that the supply agreement was not an exclusive arrangement. (ECF No. 69-1, PageID #2717–18.) But Romero testified that the supply agreement did not cover all of the products that Sherwin-Williams sold to

14

Benedettini because "it grows as we get more products in line, because the goal for here is to get all 100 percent of their coatings business."  (ECF No. 67-2, PageID #1554.)

### B.4.   Annual Rebates

Under the supply agreement, if net sales exceeded a certain amount, Sherwin-Williams would provide Benedettini with an annual rebate.  (ECF No. 29, ¶ 29, PageID #322; ECF No. 29-1, ¶ 6, PageID #329–30.)  According to Sherwin-Williams, Benedettini received annual rebates under the supply agreement on all of its purchases for the first four years of the agreement, based on net sales that included purchases of the UV coating.  (ECF No. 29, ¶ 38, PageID #323–24.)  Further, Sherwin-Williams alleges that Benedettini "expected and was aware that it received rebates pursuant to the Supply Agreement on its purchases of V86FH0257, V86FH0258, and V86CH0003."  (*Id.*, ¶¶ 39 & 44, PageID #324 & #325.)

In January 2019, Sherwin-Williams issued a rebate check to Benedettini for the period of November 1, 2017 to October 31, 2018, which provided the rebate amount and stated that it was based on net sales for that period.  (ECF No. 62-11, PageID #897; ECF No. 63-6, PageID #1110.)  Benedettini deposited the rebate check into one of its accounts.  (ECF No. 63, PageID #962.)  In January 2020, Sherwin-Williams sent Benedettini the second rebate check, which Benedettini also accepted. (ECF No. 63-7, PageID #1111–12; ECF No. 63, PageID #962.)  In December 2020, Benedettini accepted a third rebate check from Sherwin-Williams.  (ECF No. 63-8, PageID #1113; ECF No. 63, PageID #962.)  In December 2021, Benedettini accepted a fourth rebate check from Sherwin-Williams.  (ECF No. 63-9, PageID #1114; ECF

No. 63, PageID #962.) In the email regarding the last rebate check, Sherwin-Williams explained to Benedettini that it was issuing a rebate check "[p]er the terms of the Supply Agreement with Benedettini Cabinets, L.P." (ECF No. 63-9, PageID #1114.) Further, Sherwin-Williams provided the rebate amount, explained that it was a certain percentage of net sales, and provided the net sales amount from the period of November 1, 2020 through October 31, 2021. (*Id.*)

Benedettini claims that "Sherwin-Williams never provided Benedettini an accounting of any rebates made to Benedettini" and disputes that it knowingly received and accepted rebates on its purchases of V86FH0257. (ECF No. 33, ¶¶ 38–39 & ¶ 44, PageID #404 & #406.) But Tom Petrosewicz, who serves as Benedettini's outside chief financial officer, testified that the rebates were based on the sales of "everything that we bought from Sherwin-Williams." (ECF No. 63-3, PageID #1072–74.) Petrosewicz provided Mr. Benedettini with estimates of annual rebates on the assumption that the rebate would be calculated based on purchases of all products from Sherwin-Williams, and he testified that the rebate checks were consistent with his estimates when they came in. (*Id.*, PageID #1073–74.) Further, in August 2020, Bible requested that Benedettini's accounting manager provide him with the amount that Benedettini spent with Sherwin-Williams in the first half of that year. (ECF No. 63-10, PageID #1116.) The accounting manager responded with the amount Benedettini spent and the rebate it had received and offered to prepare a report. (*Id.*)

16

Although Bible claims to have noticed after signing the supply agreement that the product number V86FH0257 was not on Exhibit A, Benedettini continued to accept and expect annual rebates, and he did not point out this fact to anyone at Benedettini or Sherwin-Williams. (ECF No. 63-1, PageID #1002–05.) Benedettini declined its final rebate check because of Sherwin-Williams's alternative counterclaim for the return of the rebates. (ECF No. 63, PageID #962.) Benedettini has not returned the four rebates it accepted from Sherwin-Williams. (*Id.*, PageID #962–63.) Benedettini claims that it only ever purchased one product on Exhibit A to the supply agreement, V84F90020, described as "Clear 20 Sheen Conv Varnish," and it paid $53,386.80 for it. (ECF No. 33, ¶ 35, PageID #404; ECF No. 60-6, PageID #742.)

### C. Frost

In May 2020, Benedettini customers began posting online that their cabinets were developing a white, hazy deposit or "frost." (ECF No. 19, ¶ 22, PageID #147.) Benedettini determined that cabinets finished with UV 257 developed this frost when exposed to humidity, an issue Benedettini says it did not previously experience with its cabinets. (*Id.*) In its papers and at oral argument, Benedettini provided an image of the alleged frosting taken from a Google review:



(ECF No. 69-1, PageID #2708–09.)

Benedettini notified Sherwin-Williams of the issue, and Sherwin-Williams initiated its own investigation.  (ECF No. 19, ¶ 24, PageID #147.)  Sometime after May 2020, Sherwin-Williams initially "attempted to blame a chemical [company] neighbor of Benedettini" for causing the issue by emitting an airborne surfactant. (*Id.*, ¶ 24, PageID #147–48.)  Sherwin-Williams dismissed that theory in March 2021. (*Id.*, ¶ 25, PageID #148.)  During the investigation, Benedettini also discovered that cabinets stained in a lighter finish and treated with UV 257 were yellowing.  (*Id.*, ¶ 26, PageID #148.)  Sherwin-Williams representative Kevin LaFavers represented

18

to Benedettini's plant manager Kevin Roach that other customers used UV 257 without issue. (*Id.*, ¶ 27, PageID #148.)

Benedettini believes that Sherwin-Williams switched it to a different UV coating, UV 292, in March 2021. (*Id.*, ¶ 28, PageID #148.) At that time, Mark Portwood, an employee of Sherwin-Williams, allegedly informed Benedettini that UV 257 was not intended for use on light stains. (*Id.*, ¶ 30, PageID #149.) By then, Benedettini had applied UV 257 to light stains for at least four years "at Sherwin-Williams's direction." (*Id.*) In June 2021, Sherwin-Williams started selling Benedettini another coating, UV 297, for darker stained cabinets. (*Id.*, ¶¶ 28–29, PageID #148.)

To date, Benedettini has had to remove and refinish cabinets in several homes due to frosting. (*Id.*, ¶ 31, PageID #149.) This process typically costs more than $15,000 per home. (*Id.*) At oral argument, Benedettini alleged that the frosting occurred in over 153 homes. According to Benedettini, in May 2020, both a scientist and a sales director at Sherwin-Williams internally raised an issue with one of the ingredients of the UV coating, but Sherwin-Williams allegedly ignored both suggestions and did not inform Benedettini. (ECF No. 69-1, PageID #2709–10.)

Benedettini alleges that, in 2021, Sherwin-Williams identified an ingredient in UV 257 that might be the cause of the issue. (*Id.*, PageID #2710.) According to Benedettini, Sherwin-Williams requested that the manufacturer of the ingredient test whether the ingredient "broke down into the chalky substance," which confirmed that the ingredient "was chalking Benedettini's cabinets installed in thousands of

homes." (*Id.*, PageID #2710–11.)  When Sherwin-Williams switched the product it supplied to Benedettini from UV 257 to UV 292 and UV 297, the only ingredient change was the one that allegedly caused the frosting.  (*Id.*, PageID #2711.)

## STATEMENT OF THE CASE

Plaintiff filed an amended complaint asserting four claims for relief:

Count One:  fraud/fraudulent inducement;

Count Two:  negligent misrepresentation;

Count Three: breach of express warranty; and

Count Four:  breach of implied warranties.

(ECF No. 19.)  It alleges that Defendant and its employees misrepresented UV 257's performance capabilities to induce Benedettini to purchase the product.  (*Id.*, ¶¶ 36–47, PageID #150–53.)  Plaintiff argues that Defendant breached express and implied warranties because UV 257 frosted on Benedettini's cabinets.  (*Id.*, ¶¶ 49–59, PageID #153–55.)

Defendant filed an amended counterclaim asserting two claims for relief:  a declaratory judgment (Count One); and unjust enrichment (Count Two).  (ECF No. 29.)  Specifically, Defendant seeks a declaratory judgment that Benedettini's purchases of the UV coating were subject to the exclusions and limitations of the supply agreement.  (*Id.*, ¶¶ 50–55, PageID #326–27.)  In its alternative claim for unjust enrichment, Defendant alleges that Plaintiff accepted rebates, favorable pricing, and prepaid shipments without objection.  (*Id.*, ¶¶ 56–60, PageID #327–28.)  If the supply agreement does not govern the parties' relationship, Defendant requests

that the Court order restitution of all of the rebates, paid shipping, and other benefits that Sherwin-Williams provided in the course of its relationship with Benedettini. (*Id.*)

Previously, Defendant moved for a partial judgment on the pleadings on Counts One, Two, and Three. (ECF No. 34.) Defendant argued that the supply agreement barred Plaintiff's claims for fraud, negligent misrepresentation, and express warranty and that the economic loss rule barred its tort claims. (ECF No. 34-1, PageID #429–33.) Also, Defendant argued that Count One failed to plead fraud with particularity under Rule 9(b), Plaintiff failed to plead the elements of its fraud and negligent misrepresentation claims, and that Plaintiff's negligent misrepresentation claim was untimely. (*Id.*, PageID #434–44.) The Court granted in part and denied in part the motion. (ECF No. 45.) Specifically, the Court dismissed Count One of Plaintiff's amended complaint except with regard to a representation made by Mr. Karnstein on or about October 10, 2017. (*Id.*, PageID #589.) The Court denied the rest of the motion. (*Id.*)

The parties filed cross-motions for summary judgment. (ECF No. 64; ECF No. 69.) Specifically, Defendant filed a motion for summary judgment raising contractual defenses. (ECF No. 64.) Plaintiff filed its own motion for summary judgment on Count One of the amended counterclaims, Defendant's request for a declaratory judgment regarding the contractual limitations of the supply agreement. (ECF No. 69.) On October 2, 2025, the Court held oral argument on the parties' cross-motions for summary judgment.

21

## ANALYSIS

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  On a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party. *Kirilenko-Ison v. Board of Educ. of Danville Indep. Schs.*, 974 F.3d 652, 660 (6th Cir. 2020) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The moving party has the initial burden of establishing that there are no genuine issues of material fact as to an essential element of the claim or defense at issue.  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 & n.12 (6th Cir. 1989); *Chappell v. City of Cleveland*, 584 F. Supp. 2d 974, 988 (N.D. Ohio 2008).  After discovery, summary judgment is appropriate if the nonmoving party fails to establish "an element essential to that party's case and upon which that party will bear the burden of proof at trial."  *Tokmenko v. MetroHealth Sys.*, 488 F. Supp. 3d 571, 576 (N.D. Ohio 2020) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

The Court's function at this stage is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  "The party seeking summary judgment has the initial burden of informing the court of the basis for its motion" and identifying the portions of the record "which it believes demonstrate the absence of a genuine issue of material fact."  *Tokmenko*, 488 F. Supp. 3d at 576 (citing

22

*Celotex Corp.*, 477 U.S. at 322).  Then, the nonmoving party must "set forth specific facts showing there is a genuine issue for trial." *Id.* (citing *Anderson,* 477 U.S. at 250).  "When the moving party has carried its burden under Rule 56(c), its opponent must do more than show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586.

If a genuine dispute exists, meaning that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," summary judgment is not appropriate.  *Tokmenko*, 488 F. Supp 3d at 576 (citing *Anderson*, 477 U.S. at 250).  However, if "the evidence is merely colorable or is not significantly probative," summary judgment for the movant is proper.  *Id.*  The "mere existence of some factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Anderson*, 477 U.S. at 247–48).  "Just as a plaintiff may not rely on conclusory allegations to proceed past the pleading stage, so too a plaintiff may not rely on conclusory evidence to proceed past the summary-judgment stage." *Viet v. Le*, 951 F.3d 818, 823 (6th Cir. 2020) (cleaned up) (citations omitted).  "Conclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment." *Id.* (quoting *Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009)).

To determine whether a genuine dispute about material facts exists, it is not the Court's duty to search the record; instead, the parties must bring those facts to the Court's attention. *See Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th

Cir. 1996).  Ultimately, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251.

"[W]here, as here, the parties filed cross-motions for summary judgment, 'the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *McKay v. Federspiel*, 823 F.3d 862, 866 (6th Cir. 2016) (quoting *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)).  Therefore, cross-motions for summary judgment do not warrant granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed. *Langston v. Charter Twp. of Redford*, 623 F. App'x 749, 755 (6th Cir. 2015).

## I.   Applicability of the Supply Agreement

Sherwin-Williams presents—and Benedettini disputes—two arguments regarding its assertion that the warranty provision in Paragraph 10 of the supply agreement applies to its sale of UV 257 coating to Benedettini:  (1) the supply agreement is a requirements contract applying to all paints, coatings, and related products that Sherwin-Williams sold to Benedettini over the contract period; and (2) the product listed in Exhibit A of the supply agreement titled HG1516V86 is the same product as the UV 257 coating that Sherwin-Williams sold to Benedettini.  (ECF No. 64-1, PageID #1140–54; ECF No. 69-1, PageID #2720–36; ECF No. 74, PageID #2848–68; ECF No. 75, PageID #2876–90.)  The Court need not reach the second issue to resolve the pending cross-motions.

24

As it did when it moved for judgment on the pleadings (ECF No. 34-1, PageID #421), Sherwin-Williams argues that the supply agreement, as a requirements contract, governs all business with Benedettini (ECF No. 64-1, PageID #1141). Benedettini contends that the four corners of the contract preclude such an interpretation, as does the evidence that Sherwin-Williams sold a different UV coating to Benedettini. (ECF No. 69-1, PageID #2713.)

### I.A.    Ordinary and Plain Meaning

The Court begins with the ordinary and plain meaning of the supply agreement. Paragraph 13 provides that the parties agree that Ohio law governs any dispute arising out of the contract. (ECF No. 29-1, PageID #331.) Generally, "contracts should be construed so as to give effect to the intention of the parties." *Aultman Hosp. Ass'n v. Community Mut. Ins. Co.*, 46 Ohio St. 3d 51, 544 N.E.2d 920, 923 (Ohio 1989); *Eastham v. Chesapeake Appalachia, L.L.C.*, 754 F.3d 356, 361 (6th Cir. 2014) (quoting *Sunoco, Inc. (R&M) v. Toledo Edison Co.*, 129 Ohio St. 3d 397, 2011-Ohio-2720, 953 N.E.2d 285, ¶ 37). The parties' intent is "presumed to reside in the language they chose to employ in the agreement." *Anzalaco v. Graber*, 2012-Ohio-2057, 970 N.E.2d 1143, ¶ 19 (Ohio Ct. App.) (citing *Kelly v. Medical Life Ins. Co.*, 31 Ohio St. 3d 130, 509 N.E.2d 411, 413 (1987)). To discern the parties' intent, courts look to the plain and ordinary meaning of the language in their agreement. *Eastham*, 754 F.3d at 361. A contract "is to be read as a whole and the intent of each part gathered from a consideration of the whole." *Saunders v. Mortensen*, 101 Ohio St. 3d 86, 2004-Ohio-24, 801 N.E.2d 452, ¶ 16 (citation omitted).

25

According to the normal rules of contract construction under Ohio law, "an interpretation that would render a provision meaningless 'is neither acceptable nor desirable.'" *State v. Bethel*, 110 Ohio St. 3d 416, 2006-Ohio-4853, 854 N.E.2d 150, ¶ 51 (quoting *Hybud Equip. Corp. v. Sphere Drake Ins. Co.*, 64 Ohio St. 3d 657, 597 N.E.2d 1096, 1103 (1992)). Therefore, the Court "must give effect to each provision of the contract" if doing so is reasonable. *Cincinnati Ins. Co. v. CPS Holdings, Inc.*, 115 Ohio St. 3d 306, 2007-Ohio-4917, 875 N.E.2d 31, ¶ 17 (citing *Expanded Metal Fire-Proofing Co. v. Noel Constr. Co.*, 87 Ohio St. 428, 101 N.E. 348, 350 (1913)); *Savedoff*, 524 F.3d at 763 (quoting *Stone v. National City Bank*, 106 Ohio App. 3d 212, 665 N.E.2d 746, 752 (1995)).

### I.A.1. Definition of "Products"

"Although words and terms within a contract will be given their ordinary meaning, . . . when parties to a contract have given a word a specific meaning by expressly defining it in the contract, that definition will generally override whatever definition might otherwise be established by an examination of the word's ordinary meaning or common usage." *Sutton Bank v. Progressive Polymers, L.L.C.*, 161 Ohio St. 3d 387, 2020-Ohio-5101, 163 N.E.3d 546, ¶ 18 (citations omitted). Further, "when a word is expressly defined, then that word should be given its expressed meaning whenever it is used in the contract." *Id.* (citations omitted).

As previously noted, Paragraph 2 of the supply agreement reads:

> During the Term of this Agreement, Customer shall utilize Sherwin-Williams as Customer's supplier for paints, coatings, and related products utilized by Customer. Specifically, Customer shall purchase its requirements for all paints, coatings, and related products from Sherwin-Williams. Upon receipt of a purchase order from Customer,

26

> Sherwin-Williams hereby agrees to sell to Customer the paints, coatings, and related products that are set forth on Exhibit A (collectively referred to herein as the "Products").

(ECF No. 29-1, PageID #329.)  As the Court observed in its ruling on Defendant's motion for judgment on the pleadings, the language of the third sentence of this paragraph contradicts the first two.  (ECF No. 45, PageID #570.)  Specifically, the first two sentences provide that Benedettini will purchase its *requirements* for paints, coatings, and related products from Sherwin-Williams.  But the third sentence limits the products that Sherwin-Williams agrees to sell to Benedettini to those listed on Exhibit A to the supply agreement and, for them, uses the defined term "Products." It provides that "Sherwin-Williams hereby agrees to sell to Customer the paints, coatings, and related products *that are set forth on Exhibit A* (collectively referred to herein as the 'Products')."  (ECF No. 29-1, PageID #329 (emphasis added).)

### I.A.2. Structure of the Supply Agreement

Other provisions of the supply agreement use the term "Products," including those relating to price, payment, delivery, and warranties.  (*Id.*, PageID #329–30.) For example, Paragraph 4 regarding payment states that it applies to "all Products purchased by Customer from Sherwin-Williams during a specific calendar month." (*Id.*, PageID #329.)  This provision contains a two-percent discount for timely payment.  (*Id.*)  Similarly, the rebate provision in Paragraph 6 calculates the payment to Benedettini based on net sales of Products.  (*Id.*, ¶ 6.B., PageID #330.)  And the representations and warranties clause in Paragraph 10 limits the warranty for manufacturing defects to Products and disclaims all other warranties and the liability

27

of Sherwin-Williams based on the sale of Products—presumably the defined term. (*Id.*, ¶ 10, PageID #330.)

Sherwin-Williams argues that, "under Ohio law, a contract that uses the language of 'requirements' is 'unambiguously' a requirements contract." (ECF No. 64-1, PageID #1141.) In support of this contention, it cites a case that defines a requirements contract as "a contract in writing where one party promises to buy exclusively, and the other party agrees to deliver specific goods or services which the buyer may need for a certain period of time." *Bass, Hurwitz & Poliner, CPA's v. State*, No. 88AP-1120, 1989 WL 87078, at *2 (Ohio Ct. App. Aug. 3, 1989) (citing *Fuchs v. United Motor Stage Co.*, 135 Ohio St. 509, 21 N.E.2d 669, 670 (1939)). But the contract in that case simply provided that the appellant would supply "the State's requirements" for nursing home audits in particular districts during the agreement's term. *Id.* Because of the internal inconsistency in Paragraph 2, the Court cannot say that the language of the supply agreement "unambiguously" makes it a requirements contract. Nor does the Court find availing the other arguments that Sherwin-Williams makes to overcome the plain language of the supply agreement.

### I.B. Parol Evidence

Ohio adopts the Uniform Commercial Code's rule for parol or extrinsic evidence that a final written agreement "may be explained . . . by course of performance, course of dealing, or usage of trade." Ohio Rev. Code § 1302.05(A). Such evidence may be "relevant in ascertaining the meaning of the parties' agreement, may give particular meaning to specific terms of the agreement, and may supplement or qualify the terms of the agreement." Ohio Rev. Code § 1301.303(D). Under this definition, parol or

28

extrinsic evidence does not depend on an ambiguity in the contract.  Instead, such evidence shows how the parties understood their agreement in practice.  "A finding of ambiguity is not necessary for the admission of evidence of usage of trade, course of dealing, or course of performance."  43 Ohio Jur. 3d *Evidence and Witnesses* § 527 (2025).

Sherwin-Williams argues that the parties' course of performance and usage of trade demonstrate that the parties intended the supply agreement to apply to purchases of UV 257.  (ECF No. 64-1, PageID #1144.)  Benedettini contends that the supply agreement precludes Sherwin-Williams from referencing such evidence and that such evidence does not support its argument in any event.  (ECF No. 69-1, PageID #2721–22.)  At oral argument, Benedettini cited *United States Fidelity & Guaranty Co. v. St. Elizabeth Medical Center*, 129 Ohio App. 3d 45, 716 N.E. 2d 1201, 1208 (1998), to argue that "courts may not use extrinsic evidence to create an ambiguity; rather, the ambiguity must be patent, *i.e.*, apparent on the face of the contract."  *See also Schachner v. Blue Cross & Blue Shield of Ohio*, 77 F.3d 889, 893 (6th Cir. 1996).  But the Court does not determine that the supply agreement is ambiguous.  Nor does the extrinsic evidence seek to create an ambiguity or contradict the terms of the supply agreement.

Instead, the extrinsic evidence in this case has relevance to ascertain the meaning of the parties' agreement and gives meaning to the specific terms of the parties' agreement.  *See* Ohio Rev. Code § 1301.303(D).  "The unambiguous terms of a contract cannot be contradicted by extrinsic evidence such as course of performance,

though they can be explained or supplemented by such evidence."  *Foley v. LG Elecs., Inc.*, No. 1:16-cv-1479, 2017 WL 2691790, at *4 (N.D. Ohio June 22, 2017) (citing Ohio Rev. Code § 1302.05).

### I.B.1. Amendment Procedure

As a threshold matter, Benedettini argues that Sherwin-Williams cannot use evidence of course of performance and usage of trade, arguing that Paragraph 11 of the supply agreement contains "a special procedure . . . that the parties would have to use to amend or modify the Supply Agreement."  (ECF No. 69-1, PageID #2721; ECF No. 75, PageID #2878 & #2880.)  Benedettini cites Section 1302.12(B) of the Ohio Revised Code, which provides in relevant part that "[a] signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded."  Benedettini claims that the parties had followed this procedure on previous occasions.  (ECF No. 69-1, PageID #2721.)

Paragraph 11 of the supply agreement reads:  "This Agreement may be amended and/or modified only by a written document, signed by Sherwin-Williams and Customer that specifically states it is an amendment to this Agreement."  (ECF No. 29-1, ¶ 11, PageID #330.)  Based on this provision, Benedettini argues that Paragraph 11 "builds an insurmountable wall around the definition of 'Products'" and that "[n]either usage of trade nor course of dealing can change that definition."  (ECF No. 69-1, PageID #2721–22.)  But the Court may assess course of performance and usage of trade to explain or supplement a final written agreement to give "particular meaning to specific terms of the agreement."  Ohio Rev. Code § 1301.303(D).  Such evidence assists in understanding how the parties understood the terms of their

contract. That evidence does not represent or work a modification, recission, or amendment of any term of the supply agreement. Therefore, Paragraph 11 does not bar the Court from assessing course of performance and usage of trade in assessing how the parties understood certain terms in their contract. Indeed, Paragraph 11 contains no language to that effect. (ECF No. 29-1, ¶ 11, PageID #330.)

The cases on which Benedettini relies are not to the contrary. In *Watkins & Son Pet Supplies, Inc. v. Iams Co.*, 254 F.3d 607, 613–14 (6th Cir. 2001), the court determined that the plaintiff could not introduce evidence of additional terms that contradicted the integrated agreement. Here, Sherwin-Williams does not look to extrinsic evidence to introduce additional terms or contradict the supply agreement but, instead, to show how the parties performed under it. In *General Electric Co. v. S & S Sales Co.*, No. 1:11-cv-00837, 2013 WL 174559, at *2 (N.D. Ohio Jan. 16, 2013), the court determined that the plaintiff could not introduce evidence of a modification of shipments to alter its contractual obligations. In this case, the point is not to modify or reform the supply agreement—Paragraph 11 forecloses doing so—but to understand the terms of the supply agreement and its plain language. In *Hamilton Insurance Services, Inc. v. Nationwide Insurance Cos.*, 86 Ohio St. 3d 270, 714 N.E.2d 898, 901 (1999), the Ohio Supreme Court merely stated that, when assessing extrinsic evidence, "there can be no implication inconsistent with the express terms" of a written contract. And the Court's decision in *RAM Construction Services of Cleveland, LLC v. Key Construction, Inc.*, 624 F. Supp. 3d 884, 892–93 (N.D. Ohio

2022), had to do with a failure to follow proper contractual procedures for change orders, which is not at issue here.

Even if considered a modification, courts in this Circuit acknowledge that the parties' course of performance can modify a contract "[e]ven where, as here, an agreement requires all modifications to be in writing." *Marietta Health Care Physicians, Inc. v. Yoak*, No. 2:19-cv-5626, 2022 WL 255664, at *8 (S.D. Ohio Jan. 27, 2022). Therefore, Paragraph 11 does not preclude assessing the parties' course of performance or trade usage in this case.

### I.B.2. Course of Performance

"Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement." Restatement (Second) of Contracts § 202(4) (1981). Where the course of performance results in multiple inferences that suggest contradictory evidence of the agreement's terms, such evidence does "not satisfy the initial burden . . . to demonstrate the absence of a genuine issue of material fact on the disputed term . . . as summary judgment requires." *Kevin O'Brien & Assocs. Co., LPA v. PLS Fin. Sols. Of Ohio*, 2024-Ohio-3170, 251 N.E.3d 712, ¶ 31 (Ohio Ct. App.).

Section 1301.303(A) of the Ohio Revised Code defines course of performance as "a sequence of conduct between the parties to a particular transaction that exists" where:

(1)    The agreement of the parties with respect to the transaction involves repeated occasions for performance by a party; and

(2)    The other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection.

Typically, course of performance presents questions of fact; however, courts can still resolve issues at the summary judgment stage by analyzing course of performance where there is no genuine dispute of material fact.  *See, e.g.*, *Novelis Corp. v. Anheuser-Busch, Inc.*, 559 F. Supp. 2d 877, 889 (N.D. Ohio 2008).

Sherwin-Williams points to several pieces of evidence that it claims demonstrate that the parties "intended the Supply Agreement to apply to UV 257 and all other products."  (ECF No. 64-1, PageID #1145.)

### I.B.2.a. The Amendment

First, the parties signed an extension to the supply agreement at the end of the contract term and after Benedettini filed this lawsuit.  (ECF No. 59-7, PageID #663.)  According to Sherwin-Williams, this fact shows that the supply agreement applied to products other than those listed on Exhibit A.  (*Id.*, PageID #1145 & #1154; ECF No. 59-7, PageID #663.)  To support this contention, Sherwin-Williams cites two excerpts from Bible's deposition.  (ECF No. 64-1, PageID #1145.)  But the page it cites for the first excerpt appears to be missing from the record.  (*See* ECF No. 63-1, PageID #1003–04.)  The second relates to the signing of the supply agreement, not its amendment, and questions Bible on the fact that Benedettini purchased hundreds of items from Sherwin-Williams, but Exhibit A only listed six.  (ECF No. 63, PageID #949–50.)

33

Sherwin-Williams also cites Bible's deposition testimony that Benedettini wanted to extend the supply agreement and continue to buy products from Sherwin-Williams because "[it had] to have product to finish cabinets." (*Id.*, PageID #966–67.) Also, he testified that Benedettini used UV coatings other than UV 257 since 2021, (ECF No. 63-1, PageID #1008), but still signed the extension. In response, Benedettini argues that the amendment to the supply agreement "reaffirms the continuing force of the Supply Agreement, such as Exhibit A's list of Products" and forecloses an argument that "that list of Products had grown." (ECF No. 75, PageID #2882.) At bottom, the amendment to the supply agreement does not change the fundamental positions of the parties. It does little more than extend the agreement for a brief time. Beyond that, for all the ink (so to speak) the parties spend on this issue, it does not provide evidence one way or another on how the parties understood or acted under the contract.

### I.B.2.b. Sales Allowance

Sherwin-Williams cites Benedettini's acceptance of a sales allowance after it entered into the supply agreement, which it argues "was expressly an incentive for Benedettini to change from Valspar and enter into a five-year contract with Sherwin-Williams as its supplier." (ECF No. 64-1, PageID #1146.) Sherwin-Williams argues that no reasonable jury would believe that Benedettini received this payment "with no corresponding obligation to purchase its paint and coating requirements from Sherwin-Williams." (*Id.*, PageID #1146–47.) Further, it cites Paragraph 8 of the supply agreement, which states that, in the occurrence of any acceleration events, the "Customer shall refund to Sherwin-Williams a pro-rata portion of the amount

provided as the Sales Allowance as calculated in accordance with Paragraph 8(B) of this Agreement," which referred to the refund calculation. (ECF No. 29-1, ¶ 8, PageID #330.)

Benedettini does not dispute that it received the sales allowance for which the supply agreement provided. This undisputed fact shows that the parties understood that the supply agreement governed their relationship. But it does not directly speak to the core issue in dispute—whether the contract limits liability for UV 257. On that score, the Court cannot weigh the significance of this fact or make any inference about how a jury might evaluate it. *Anderson*, 477 U.S. at 249.

### I.B.2.c. Pricing

Sherwin-Williams contends that Benedettini "took advantage of the Supply Agreement" for its purchases of UV 257. (ECF No. 64-1, PageID #1145.) Paragraph 3 of the supply agreement provides in relevant part that "the prices for the Products shall be the prices specified on Exhibit A" and that "Sherwin-Williams may increase the prices of each of the Products in Sherwin-Williams' sole discretion, provided that in no event shall prices for the Products be increased . . . on more than one occasion during any contract year." (ECF No. 29-1, ¶ 3, PageID #329.) The undisputed evidence consisting of invoices and purchase orders shows that Benedettini purchased UV 257 at the price listed on Exhibit A for the first year of the supply agreement. (ECF No. 62-7; ECF No. 63-11.) Bible did not dispute this fact at his deposition. (ECF No. 63, PageID #960.) Further, as Sherwin-Williams points out (ECF No. 64-1, PageID #1146), Benedettini points to no evidence that Sherwin-Williams failed to follow this provision of the supply agreement.

Benedettini argues that the fact that it initially paid the same price for UV 257 as the price listed for HG1516V86 on Exhibit A does not establish that the two products were the same because "[d]ifferent products can have the same price." (ECF No. 69-1, PageID #2734.)  Therefore, it argues that "[p]ricing sends, at most, an ambiguous signal." (*Id.*)  In *Novelis*, 559 F. Supp. 2d at 892, the plaintiff made a similar argument that evidence that it accepted or acquiesced to a certain price "is one inference that can be drawn from the course of performance" and renders the question a "factual dispute appropriate for jury resolution."  The court disagreed, determining that it was undisputed that "the parties consistently exhibited their intent that the price . . . was to be calculated in the same manner as the other [products]." *Id*.  On summary judgment, it is undisputed that Benedettini initially paid the same price for UV 257 as the price listed for HG1516V86 on Exhibit A to the supply agreement.  As in *Novelis*, this uncontested fact bears on the course of performance without necessarily requiring fact finding by a jury and lends support to Defendant's position.

### I.B.2.d. Annual Rebates

Sherwin-Williams also argues that Benedettini benefitted from the annual rebates provided in the supply agreement.  (ECF No. 64-1, PageID #1145.) Paragraph 6 provides for an annual rebate on net sales that hit a certain target. (ECF No. 29-1, ¶ 6, PageID #329–30.)  Sherwin-Williams points out that "both parties treated all products as part of 'Net Sales' for purpose of rebates." (ECF No. 64-1, PageID #1146.)  It provides undisputed evidence of email and text exchanges with Benedettini in which Bible acknowledges the amount of the rebate. (ECF No. 62-11;

ECF No. 63-7; ECF No. 63-8; ECF No. 63-9.)  Further, Bible testified that Benedettini accepted rebates for the first four years of the supply agreement.  (ECF No. 63, PageID #961–62.)  Regarding the amount of the rebates, Tom Petrosewicz, who provides outside CFO services to Benedettini, testified that they were based on sales of "everything that we bought from Sherwin-Williams," and he provided estimates to Mr. Benedettini based on this assumption.  (ECF No. 63-3, PageID #1072–74.) Therefore, Sherwin-Williams contends that Benedettini treated its "purchases as 'Products,'" whether formally listed on Exhibit A or not, and has not returned any of the rebates it accepted.  (ECF No. 64-1, PageID #1146.)

### I.B.2.d.i. Rebate Calculations

Benedettini argues that it did not know how Sherwin-Williams calculated rebates and that under Paragraph 6 of the supply agreement Sherwin-Williams had responsibility for calculating the rebates based on its sales records.  (ECF No. 69-1, PageID #2735; ECF No. 29-1, PageID #329–30.)  Benedettini claims that Sherwin-Williams did not send "an accounting or reconciliation of the sales that were included to calculate the rebate amount" when it paid the rebates to Benedettini.  (ECF No. 69-1, PageID #2735.)  It cites the deposition of LaFavers (a representative of Sherwin-Williams) in which he testified that Sherwin-Williams did not provide Benedettini with a breakdown of how the rebates were calculated, but instead delivered a check without backup data. (ECF No. 67-14, PageID #2013–14.)  Another Sherwin-Williams representative, Mark Portwood, testified to the same effect, adding that there might have been conversations with someone at Benedettini "that involved a breakdown, because Benedettini had a separate rebate with their abrasives,

through their abrasives manufacturer." (ECF No. 67-1, PageID #1435–36.)  Further, Benedettini claims that Sherwin-Williams "might be exercising less than its full rights under the Supply Agreement as a customer relations tool," something it did with shipping as an inducement to keep business—meaning it might have paid rebates in excess of what the supply agreement strictly required.  (ECF No. 75, PageID #2888.)

But Benedettini's provider of CFO services testified that he was aware that rebate checks were "part of . . . the supply agreement, that there would be some type of rebate" and that such information was included in "the incentives proposal email," which stated that "Sherwin shall pay an annual rebate."  (ECF No. 67-35, PageID #2640.)  Moreover, he testified that the rebates represented "everything that we bought from Sherwin-Williams . . . [a]nd we bought more than coatings and paint from Sherwin-Williams."  (*Id.*, PageID #2654.)  When the rebate amounts came in from Sherwin-Williams in the first years of the supply agreement, he assumed they were based on Benedettini's purchases of all products from Sherwin-Williams.  (*Id.*, PageID #2670.)  Bible testified that it was important to Benedettini to receive the same rebate percentage provided in the supply agreement on as many purchases as they could because it "was an awesome benefit."  (ECF No. 67-31, PageID #2294.)  Moreover, in August 2020, Bible asked Benedettini's accounting manager how much Benedettini spent with Sherwin-Williams for the first half of that year, and she responded with the amount Benedettini spent and the amount of the rebate it had received.  (ECF No. 63-10, PageID #1116.)

Therefore, whether Benedettini knew how the rebates were calculated has no bearing on the course of performance under the contract.  It is undisputed that Benedettini knew it received rebates for its purchases from Sherwin-Williams pursuant to Paragraph 6 of the supply agreement in amounts beyond the sales of the products on Exhibit A.  For four years, Benedettini did not object to annual rebates, "despite numerous opportunities to voice its concern."  *Lancaster Glass Corp. v. Philips ECG, Inc.*, 835 F.2d 652, 659 (6th Cir. 1987).

In *Metal Seal Precision, Ltd. v. Good Time Outdoors, Inc.*, 2018-Ohio-5326, 128 N.E.3d 678, ¶ 64 (Ohio Ct. App.), the appellate court determined that the trial court properly assessed the parties' course of performance to "explain or supplement the . . . agreement" where the parties' transactions took place over the course of several months and each party acquiesced to the other's performance.  In *St. Marys v. Auglaize Cty. Bd. of Comm'rs*, 115 Ohio St. 3d 387, 2007-Ohio-5026, ¶¶ 45–46, the Ohio Supreme Court determined that the conduct of the county and the city "over a period of years" demonstrated that they agreed to a certain rate, in part because "the county never objected to the method of funding during and even beyond the expiration of the agreement, until now."  Similarly, it is undisputed that Benedettini accepted annual rebates—as provided for in the supply agreement in amounts—for four years without objection for all products it purchased from Sherwin-Williams, not just those listed on Exhibit A.  (ECF No. 63, PageID #961–62.)  This course of performance explains how the parties understood the supply agreement in practice and leaves no room for a reasonable jury to find otherwise.

### I.B.2.d.ii. Other Agreements

Benedettini also argues that Sherwin-Williams's evidence regarding rebates is unpersuasive because Sherwin-Williams provides rebates to customers that "lack a supply agreement with Sherwin." (ECF No. 69-1, PageID #2735.) Benedettini claims that this is evidence that, even if it "had reverse-engineered Sherwin's rebate calculus, it could not have concluded that the bare presence of a rebate or discount means that the definition of 'Products' expanded and UV 257 is governed by the Supply Agreement." (ECF No. 69-1, PageID #2735.) In making this argument, however, Benedettini omits testimony from LaFavers that, if Sherwin-Williams gave a rebate to customers without a supply agreement, it did so pursuant to "a rebate agreement." (ECF No. 67-14, PageID #2011.) Benedettini did not have a rebate agreement—just the supply agreement.

*   *   *

For these reasons, the Court determines that there is no genuine dispute of material fact that Benedettini knew or should have known that it accepted annual rebates from Sherwin-Williams based on its purchases of all products from Sherwin-Williams.

### I.B.2.e. Exclusivity

Finally, Benedettini argues that the supply agreement was not exclusive because "[b]oth parties acted in a manner consistent with the Supply Agreement applying to less than all of Benedettini's purchases of paints, coatings, and related products" and that Sherwin-Williams was aware of this practice and did not object. (ECF No. 69-1, PageID #2730.) In support, Benedettini cites Bible's testimony that

40

he was "[n]ot sure if [he] ever told anyone there [that Benedettini would give Sherwin-Williams] a hundred percent" of its paints and coatings business, but he "told them we'd move their coatings or stains and paints to them."   (ECF No. 67-31, PageID #2264.)   Further, Mr. Benedettini testified that Sherwin-Williams "would not be obtaining exclusive business" through the supply agreement because Benedettini "outsource[d] and [bought] other products."   (ECF No. 67-34, PageID #2496.) Notwithstanding the representations of Benedettini's employees to Sherwin-Williams, the parties' actions demonstrate that Benedettini accepted without objection for four years the benefits of the supply agreement for all of its purchases from Sherwin-Williams, including the annual rebates and pricing.

Benedettini contends that its purchases of acetone from other suppliers "breaks exclusivity" of the supply agreement.   (ECF No. 69-1, PageID #2730.)   But "a contract to furnish only part of the buyer's requirements . . . is sufficient to be a requirements contract under UCC 2-306(1)."   *Cyril Bath Co. v. Winters Indus., a Div. of the Whittaker Corp.*, 892 F.2d 465, 467 (6th Cir. 1989).   In *Cyril Bath*, the Sixth Circuit determined that the purchaser "was explicitly obligated under the agreement to purchase its tubes from [the seller]"; therefore, the parties' agreement was still a requirements contract.   *Id.* So too here.   In any event, as Sherwin-Williams indicated at oral argument and in its papers, Paragraph 14 of the supply agreement states that "[t]he waiver of a breach of any provision of this Agreement shall not constitute a waiver of a prior, concurrent, or subsequent breach of the same or of any other provision hereof."   (ECF No. 29-1, ¶ 14, PageID #331; ECF No. 74, PageID #2868.)   In

other words, even if Benedettini was obligated to purchase acetone from Sherwin-Williams, the plain language of the contract does not waive any of Benedettini's other obligations under the supply agreement. (ECF No. 74, PageID #2868.)

*   *   *

Although the parties sharply dispute the identity of the UV coating listed on Exhibit A of the supply agreement (*see, e.g.*, ECF No. 64-1, PageID #1140; ECF No. 69-1, PageID #2720–21), that dispute is not material. The record leaves no room for a reasonable jury to find that Sherwin-Williams did not pay rebates, which Benedettini accepted without objection for four years, pursuant to Paragraph 6 of the supply agreement. (ECF No. 63, PageID #961–62; ECF No. 29-1, ¶ 6, PageID #329–30.) Those rebates covered all purchases Benedettini made from Sherwin-Williams during those years. (ECF No. 62-11; ECF No. 63, PageID #961–62; ECF No. 63-3, PageID #1072–74; ECF No. 63-7; ECF No. 63-8; ECF No. 63-9; ECF No. 63-10, PageID #1116; ECF No. 67-31, PageID #2294; ECF No. 67-35, PageID #2640, #2654, #2670.) Accordingly, the Court concludes that the parties' course of performance with respect to the rebates shows that the supply agreement governs their relationship for the coatings at issue in this litigation. This determination obviates the need for the Court to address the parties' arguments about the usage of trade and estoppel.

## II. Application of Warranty Disclaimers

Determining that the supply agreement covers UV 257 does not end the parties' disputes. Benedettini contests the applicability of the supply agreement's disclaimers of warranties and limitations of liability. It argues that, "[f]or those disclaimers to apply, they must be conspicuous and in writing," pursuant to Ohio

42

Revised Code Section 1302.29(B).  (ECF No. 76, PageID #2899.)  "That is, Sherwin must show that it conspicuously disclaimed warranties as to UV 257 in writing."  (*Id.*)

Paragraph 10 of the supply agreement reads:

Sherwin-Williams represents and warrants to Customer that all Products sold by Sherwin-Williams to Customer shall be free of manufacturing defect in accordance with the Sherwin-Williams quality control specifications in effect at the time of manufacturing.  EXCEPT FOR THE FOREGOING, SHERWIN-WILLIAMS DISCLAIMS ALL WARRANTIES ARISING OUT OF THE SALE OF PRODUCTS UNDER THIS AGREEMENT, OF ANY KIND, EXPRESS OR IMPLIED, ORAL OR WRITTEN, INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTY OF MERCHANTABILITY AND THE IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE.  IN NO EVENT SHALL SHERWIN-WILLIAMS BE LIABLE FOR SPECIAL, INDIRECT, INCIDENTAL, OR CONSEQUENTIAL DAMAGES TO CUSTOMER OR TO ANY THIRD PARTY CLAIMING BY OR THROUGH CUSTOMER.  IN NO EVENT SHALL SHERWIN-WILLIAMS LIABILITY TO CUSTOMER EXCEED SHERWIN-WILLIAMS' AGGREGATE NET AMOUNT OF PRODUCTS PAID FOR BY CUSTOMER  DURING THE TERM OF THIS AGREEMENT.

(ECF No. 29-1, ¶ 10, PageID #330.)  This language, coming in a paragraph titled "**REPRESENTATIONS AND WARRANTIES**," underlined and written in all caps and bold so that it stands out, satisfies the requirements of Ohio law.  Ohio Rev. Code § 1302.29(B).

## III.  Failure of Essential Purpose

Benedettini argues in its papers and at oral argument that Sherwin-Williams "would have the Supply Agreement disclaim every express and implied warranty for UV 257 and leave Benedettini no ability to recover," such that the supply agreement fails of its essential purpose.  (ECF No. 69-1, PageID #2738.)

Section 1302.93(B) of the Ohio Revised Code largely adopts Section 2-719 of the Uniform Commercial Code, providing that "[w]here circumstances cause an

exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided" in other sections of the code. *Traxler v. PPG Indus., Inc.*, 158 F. Supp. 3d 607, 613–14 (N.D. Ohio 2016). "A limited or exclusive remedy can fail of its essential purpose if it deprives the purchaser of the substantial value of its bargain, leaving the purchaser without a remedy." *Lincoln Elec. Co. v. Technitrol, Inc.*, No. 1:08 CV 2346, 2010 WL 2219341, at *4 (N.D. Ohio June 2, 2010) (citation omitted).

The plain text of Paragraph 10 belies Benedettini's argument. That provision does not disclaim all warranties or remedies. Instead, it provides a limited warranty for manufacturing defects. (ECF No. 29-1, ¶ 10, PageID #330.) Further, the parties agreed that Sherwin-Williams would have no liability for special, indirect, or consequential damages or to any customer of Benedettini. (*Id.*) Also, they limited the liability of Sherwin-Williams to the "AGGREGATE NET AMOUNT OF PRODUCTS PAID FOR BY CUSTOMER DURING THE TERM OF THIS AGREEMENT." (*Id.*)

"Contracting parties are free to determine which implied warranties shall accompany their transaction," and "both the implied warranties of merchantability and of fitness may be excluded or modified." *WEL Companies, Inc. v. Haldex Brake Prods. Corp.*, 467 F. Supp. 3d 545, 562–63 (S.D. Ohio 2020) (quoting *Chemtrol Adhesives, Inc. v. American Mfrs. Mut. Ins. Co.*, 42 Ohio St. 3d 40, 537 N.E.2d 624, 638 (1989)).

### III.A. Deprivation of the Substantial Value of the Bargain

When it comes to a failure of essential purpose, the identities of the parties, the products, and the warranty provisions at issue influence courts' analyses as to whether certain warranties fail of their essential purpose to "deprive[] the purchaser

44

of the substantial value of its bargain." *Lincoln Elec.*, 2010 WL 2219341, at *4 (citation omitted).  For example, several cases analyze failure of essential purpose in the context of provisions regarding repair and replacement of products or assurances that a product will conform to the applicable manufacturer's specifications. *See, e.g.*, *Chemtrol Adhesives*, 537 N.E.2d at 638 (provision regarding repair and replacement at issue); *Lincoln Elec.*, 2010 WL 2219341, at *1 (provision stating that transformers would "conform to the applicable manufacturer's specifications" and providing for refund, repair, or replacement of such products); *WEL Companies*, 467 F. Supp. 3d at 562–63 (warranty limited to replacement or credit); *Dippin' Dots, LLC v. Travelers Prop. Cas. Co. of America*, 353 F. Supp. 3d 631, 639 (W.D. Ky. 2018) (acknowledging that "the 'failure of essential purpose' exception best applies to situations where the contract limits liability to repair or replacement of a product and that product is in a condition where the defect cannot be fully corrected by the repair or replacement of the defective part or product"); *Biszantz v. Stephens Thoroughbreds*, 620 F. App'x 535, 539 (6th Cir. 2015) (acknowledging that the Kentucky statute for failure of essential purpose "has been invoked most often in cases in which the exclusive remedy involves replacement or repair of defective parts, and the seller because of his negligence in repair or because the goods are beyond repair, is unable to put the goods in warranted condition").  But these types of repair-or-replace provisions do not apply to Benedettini's claims, and it does not bring a repair-or-replace claim or contend that it does.

Instead of the cases analyzing failure of essential purpose in the repair-or-replace context, *Gooch v. E.I. Du Pont de Nemours & Co.*, 40 F. Supp. 2d 863, 867 (W.D. Ky. 1999), provides a more useful framework.  There, a large farming operation purchased herbicide that allegedly stunted the growth of its corn.  Distinguishing the repair-or-replace line of cases because limited liability to repair or replace a product was not at issue, the court determined, under a provision of Kentucky law identical to Ohio's version of the Uniform Commercial Code, that a "remedy does not 'fail of its essential purpose' simply because it limits the recovery of a particular relief sought," but only "when it deprives a party of the substantial value of its bargain." *Id.* at 870 (quoting *Hill v. BASF Wyandotte Corp.*, 696 F.2d 287 (4th Cir. 1982)).

In this case, the supply agreement does not deprive Benedettini of "the substantial value of its bargain." *Id.*  Specifically, Paragraph 10 provides an avenue for recovery.  Should Benedettini prove liability on the part of Sherwin-Williams, Paragraph 10 caps any recovery at the "AGGREGATE NET AMOUNT OF PRODUCTS PAID FOR BY CUSTOMER DURING THE TERM OF THIS AGREEMENT." (ECF No. 29-1, ¶ 10, PageID #330.)  In other words, if Benedettini can establish liability, the supply agreement conspicuously permits it to recover an amount up to the total of what it paid for all paints, coatings, and related products that it purchased from Sherwin-Williams—the value of its bargain with Sherwin-Williams.

### III.B. Sophisticated Parties

Courts also distinguish failure of essential purpose cases involving breach of warranty claims by individual consumers, *see, e.g.*, *Traxler*, 158 F. Supp. 3d at 611 (consumer class action regarding products purchased from retailers), from disputes

46

"between two business entities, fully capable of bargaining over items such as the breadth and time period of the warranties on the product sold," *Venture Express, Inc. v. Vanguard Nat'l Trailer Corp.*, 585 F. Supp. 3d 1060, 1075 (M.D. Tenn. 2022) (citation omitted).    Courts outside this Circuit consider whether there is a "commercial transaction involving two sophisticated corporate entities" with "little or no disparity in the bargaining power of the parties."  *Myrtle Beach Pipeline Corp. v. Emerson Elec. Co.*, 843 F. Supp. 1027, 1044 (D.S.C. 1993).

In cases where the "contract was freely entered into by two corporations well-versed in commercial practices," the "commercial context cannot be divorced from the concept of limited remedies."  *Id.*  "Section 2-719 was intended to encourage and facilitate consensual allocations of risks associated with the sale of goods.  This is particularly true where commercial, rather than consumer sales are involved."  *V-M Corp. v. Bernard Distrib. Co.*, 447 F.2d 864, 869 (7th Cir. 1971).  "[L]imiting damages to a refund of the purchase price in a contract between 'sophisticated business entities, and where consequential damages in the event of a problem could be extensive, is a reasonable business practice.'"  *Canal Elec. Co. v. Westinghouse Elc. Corp.*, 756 F. Supp. 620, 626 (D. Mass. 1990) (citation omitted).

The record shows that Benedettini and Sherwin-Williams are both sophisticated businesses without a disparity in bargaining power under the circumstances of this case.  They entered into the supply agreement after extensive negotiations and internal deliberations.  Benedettini had other suppliers available in the market.  It agreed to the conspicuous limitations of the warranties and remedies

47

available to it under the supply agreement.  (ECF No. 29-1, ¶ 10, PageID #330.) Benedettini has "failed to plead the very premise of any failure-of-essential-purpose argument:  the actual failure of a remedy." *Siriano v. Goodman Mfg. Co.*, No. 2:14-cv-1131, 2015 WL 12748033, at *11 (S.D. Ohio Aug. 18, 2015).  Benedettini has contractual remedies available to it.  Whatever economic and market difficulties Benedettini faces as a result of the product defect it alleges, the Court may not interfere with "[c]ontracting parties [that] are free to determine which warranties shall accompany their transaction." *Chemtrol Adhesives*, 537 N.E.2d at 638.

*     *     *

For the foregoing reasons, the Court determines that the supply agreement's warranty provision does not cause the agreement to fail of its essential purpose.

## CONCLUSION

Had the Federal Trade Commission not required the divestiture of certain assets as part of the acquisition of Valspar, in all likelihood this lawsuit would not have happened.  Benedettini would have continued to purchase coatings from its incumbent supplier, which would have then been part of Sherwin-Williams.  Perhaps quality issues or other concerns would have strained or ruptured that relationship. But any dispute over those issues would have looked far different than this bitter contest and the extensive record it generated, only a small fraction of which is discussed in this ruling.  This litigation represents an additional externality or cost of regulation, one that regulatory scoring and cost-benefit analysis fails to capture— to say nothing of the hundreds of consumers who complained of the issue giving rise to this litigation that the divestiture set in motion.

For all these reasons, the Court **DENIES** Benedettini's motion for summary judgment (ECF No. 69) and **GRANTS IN PART AND DENIES IN PART** Sherwin-Williams's motion for summary judgment (ECF No. 64).  Specifically, the Court determines that Sherwin-Williams is entitled to judgment as a matter of law on its counterclaim for declaratory judgment (Count One) that Benedettini's purchases of UV 257 were subject to the exclusions and limitations of Paragraphs 10 and 17 of the supply agreement.

   **SO ORDERED.**

Dated:  November 20, 2025

         _____

           J. Philip Calabrese
           United States District Judge
           Northern District of Ohio